**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 18, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

JUSTIN CHERIF PICKEL,

     Defendant - Appellant.

No. 16-3041

_____

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. No. 2:12-CR-20083-KHV-4)**
_____

James E. Brady (Henri J. Watson, on the briefs), Watson & Dameron, Kansas City, Missouri, appearing for Appellant.

Carrie N. Capwell, Assistant United States Attorney (Thomas E. Beall, Acting United States Attorney, with her on the brief), Office of the United States Attorney for the District of Kansas, Kansas City, Kansas, appearing for Appellee.
_____

Before **TYMKOVICH**, Chief Judge, **MATHESON**, and **MORITZ**, Circuit Judges.
_____

**MATHESON**, Circuit Judge.
_____

    Justin Pickel was convicted on two counts related to the operation of a marijuana-distribution network centered in Kansas. He was sentenced to 27 months in prison and 10 years of supervised release. The court also imposed a $16,985,250

criminal forfeiture money judgment, to be paid jointly and severally by Mr. Pickel and his co-defendants.

Mr. Pickel raises six issues on appeal. He contends: (1) the district court erroneously denied his motion to suppress marijuana found in his truck after a traffic stop; (2) the Government did not present sufficient evidence to establish a single conspiracy and connect him to it; (3) the Government's failure to establish a single conspiracy led to a prejudicial variance between his superseding indictment and the trial evidence; (4) the Government did not present sufficient evidence to establish that he used a communication facility to facilitate a drug trafficking conviction; (5) his 10-year term of supervised release exceeds the statutory maximum set forth in 21 U.S.C. § 841(b)(1)(D); and (6) the district court violated 21 U.S.C. § 853(a) when it imposed joint and several forfeiture liability on him for the value of marijuana attributable to the whole conspiracy.

Exercising jurisdiction under 28 U.S.C. § 1291, we affirm Mr. Pickel's convictions and term of supervised release but reverse the forfeiture judgment and remand for resentencing regarding Mr. Pickel's forfeiture liability.

## I. BACKGROUND

### A. *Factual History*[1]

Mr. Pickel participated in a large drug distribution network that obtained marijuana from California and distributed it in Kansas. One member of the network typically would drive or fly to California from Kansas, buy the marijuana, package it, store it in a warehouse, and ship or drive it to Kansas. *United States v. Dahda* (*Los Dahda*), 853 F.3d 1101, 1106 (10th Cir. 2017).

### 1. **Drug Distribution Network**

The network began operating in 2006 when Chad Bauman, Peter Park, and Wayne Swift started working together to distribute marijuana in Kansas. In late 2008, they purchased high-grade marijuana from Stephen Rector and, in 2009, from Phillip Alarcon in California. They soon began working with brothers Los and Roosevelt Dahda, and others. The network operated for roughly seven years, but the participants and their roles varied.

### 2. **Law Enforcement's Investigation**

In late 2011, Kansas law enforcement began investigating the drug network and conducted controlled marijuana purchases from Los Dahda. In January 2012,

---

[1] As described below, the standards of review for the four fact-intensive issues Mr. Pickel raises on appeal require that we view evidence in the light most favorable to the government. Portions of this summary are drawn from *United States v. Los Dahda* (*Los Dahda*), 853 F.3d 1101 (10th Cir. 2017), and *United States v. Roosevelt Dahda* (*Roosevelt Dahda*), 852 F.3d 1282 (10th Cir. 2017), the appeals of Mr. Pickel's two co-defendants at trial.

officers obtained wiretap authorizations for two of Los Dahda's phones, and other participants' phones.

### 3. **Mr. Pickel's Involvement**

Sometime before May 2011, Mr. Pickel began helping the Dahdas with drug-related tasks. Law enforcement learned about Mr. Pickel through Los Dahda's intercepted phone calls, which contained conversations between the two.

The calls revealed Los Dahda had helped Mr. Pickel relocate from Kansas to California and funded Mr. Pickel in starting a marijuana-grow operation in his home. At Los Dahda's request, other conspirators helped Mr. Pickel by providing growing advice.[2] While in California, Mr. Pickel also assisted the network by packaging the Dahdas' marijuana for shipment to Kansas.

In late January 2012, Roosevelt Dahda and another co-conspirator drove Los Dahda's pickup truck from Kansas to California. Based on intercepted calls and physical surveillance, law enforcement believed an auxiliary fuel tank attached to the truck was filled with cash. Intercepted calls also revealed that, upon arriving in California, Roosevelt Dahda planned to stay with Mr. Pickel at his residence.

Law enforcement also conducted physical surveillance of the California operations, including surveillance of Mr. Pickel. They observed him pick up Los Dahda at the airport and host him at his residence. They also saw Mr. Pickel go to

---

[2] *See also Los Dahda*, 853 F.3d at 1108 ("Los funded a grow operation in California that was run by a co-defendant, Mr. Justin Pickel. Co-defendants Park and Paiva helped with the grow operation. Approximately 200 marijuana plants were later found at Mr. Pickel's residence." (citations omitted)).

Mr. Alarcon's residence at least twice—once carrying a duffel bag—and stay for only a few minutes.

4. **Auxiliary Fuel Tanks**

By the end of January 2012, law enforcement had information that the drug distribution network used modified auxiliary fuel tanks in their pickup truck beds to hide and transport drugs and cash. Physical surveillance revealed auxiliary tanks in the pickup trucks owned by Los Dahda, Mr. Bauman, and Mr. Pickel. Law enforcement also intercepted calls between Roosevelt and Los Dahda regarding how to "pop the top" of the auxiliary fuel tanks. On March 26, 2012, the Utah Highway Patrol stopped a co-conspirator, Mr. Rector, in Utah driving a pickup truck and found 40 pounds of marijuana in his auxiliary fuel tank.

5. **Search of Mr. Pickel's Truck**

In April 2012, Los Dahda arranged for a load of marijuana to be sent to Kansas in Mr. Pickel's truck. Intercepted calls between Los and Roosevelt Dahda showed Mr. Pickel would be driving from California to Kansas to deliver the marijuana.

On April 24, 2012, another intercepted call revealed that a Kansas customer, Dominic Mussat, had requested marijuana from Roosevelt Dahda. Mr. Dahda told Mr. Pickel about the customer's order and Mr. Pickel responded that he could change direction to deliver Mr. Mussat's order if needed.

On April 25, 2012, having tracked Mr. Pickel's location using the GPS on his cell phone, Kansas officers followed Mr. Pickel's truck, which had an auxiliary fuel tank, on Interstate 80 for at least three hours.

When it began to get dark, Kansas officers became worried they would lose sight of the vehicle and asked the Nebraska Highway Patrol to stop Mr. Pickel based on independent suspicion to avoid revealing the ongoing drug investigation. Nebraska Highway Patrol Trooper Kurt Frazey observed Mr. Pickel commit a traffic violation and also noticed an equipment violation. He then instructed Mr. Pickel to pull over. Upon approaching Mr. Pickel's truck, Trooper Frazey saw an auxiliary fuel tank in his truck bed and discovered that Mr. Pickel was traveling with his then-girlfriend and their young son. Mr. Pickel lied about his arrest history and stated travel plans that were inconsistent with those provided by his girlfriend. After Trooper Frazey issued a warning for the traffic and equipment violations, Mr. Pickel agreed to answer additional questions. When Trooper Frazey mentioned that Interstate 80 was known as a route for drug trafficking, he noted that Mr. Pickel became visibly nervous. Trooper Frazey requested consent to search the truck, but Mr. Pickel refused. By then, Nebraska Highway Patrol Trooper Gordon Downing had arrived on scene. Trooper Downing deployed his dog to sniff around the truck and the dog alerted to the presence of drugs. In addition to a small amount of personal marijuana found in the truck, a search of Mr. Pickel's auxiliary fuel tank recovered approximately 37 pounds of marijuana.

Calls intercepted the next day confirmed that the marijuana found in Mr. Pickel's truck belonged to the Dahdas. The brothers expressed disappointment at having lost Mr. Pickel's load and discussed that they would try to avoid further detection by "kick[ing] back and chill[ing]" and "run[ning] like conservative status."

6. **Search of Mr. Pickel's Residence**

On June 13, 2012, officers executed a search warrant at Mr. Pickel's California residence and found approximately 200 marijuana plants.

B. *Procedural History*

1. **Mr. Pickel's Motion to Suppress**

Mr. Pickel filed a pretrial motion to suppress the marijuana found during the Nebraska traffic stop. The magistrate judge recommended denying the motion, finding no Fourth Amendment violation because Trooper Frazey had reasonable suspicion to stop the vehicle and probable cause to search it. He found that Trooper Frazey had reasonable suspicion to stop Mr. Pickel based on an equipment violation under Neb. Rev. Stat. § 60-6283,[3] that the encounter became consensual when Mr. Pickel agreed to answer additional questions, and that Trooper Frazey developed probable cause to search the vehicle based on responses to his questions and the police dog's alert. Alternatively, the magistrate found that Trooper Frazey had probable cause to stop Mr. Pickel and search the truck based on the collective knowledge doctrine because investigating officers had probable cause that the truck was transporting marijuana.

---

[3] The statute provides:

> Every new motor vehicle or semitrailer purchased after January 1, 1956, and operated on any highway in this state shall be equipped with fenders, covers, or devices, including flaps or splash aprons, unless the body of the vehicle affords adequate protection to effectively minimize the spray or splash of water or mud to the rear of the motor vehicle or semitrailer.

Neb. Rev. Stat. § 60-6283.

- 7 -

The magistrate judge also recommended denying Mr. Pickel's request to suppress the evidence seized from the search of his residence, holding the warrant was based on probable cause and any defects were relied upon in good faith.

The district court adopted the magistrate judge's report and recommendation and denied Mr. Pickel's motion to suppress.

2. **Trial**

Mr. Pickel was tried with Los and Roosevelt Dahda and convicted of:

- Count 1: Conspiring to (1) manufacture and possess with intent to distribute 1,000 kilograms or more of marijuana; and (2) maintain a drug-involved premises in Kansas, Missouri, and California, all in or about and between January 2005 and July 30, 2012, in violation of 21 U.S.C. § 846, 856, and 841(a)(1).

- Count 70: Using a cellular telephone on April 24, 2012, to facilitate a drug trafficking offense, the drug conspiracy, in violation of 21 U.S.C. §§ 843(b).

3. **Sentencing**

The district court sentenced Mr. Pickel to 27 months in prison on each of Counts 1 and 70, to run concurrently. It also sentenced him to 10 years of supervised release on Count 1 and one year of supervised release on Count 70, to run concurrently. The court imposed a $16,985,250 forfeiture money judgment, to be paid jointly and severally by Mr. Pickel and his co-defendants.

## II. DISCUSSION

Mr. Pickel raises six issues on appeal. We affirm his convictions and term of supervised release but reverse the forfeiture judgment and remand for resentencing regarding Mr. Pickel's forfeiture liability.

A. *Denial of Motion to Suppress*

Mr. Pickel argues the district court erred in denying his motion to suppress evidence obtained from his truck during his April 25, 2012 Nebraska traffic stop. We affirm the district court's decision based on the collective knowledge doctrine.

1. **Legal Background**

   a. *Standard of review*

"When reviewing a motion to suppress, we view the evidence in the light most favorable to the government, accept the district court's findings of fact unless they are clearly erroneous, and review de novo the ultimate question of reasonableness under the Fourth Amendment." *United States v. Pettit*, 785 F.3d 1374, 1378-79 (10th Cir. 2015). In doing so, "[w]e defer to all reasonable inferences made by law enforcement officers in light of their knowledge and professional experience distinguishing between innocent and suspicious actions." *Id.* at 1379.

   b. *Probable cause, traffic stops, and vehicle searches*

Under the Fourth Amendment,[4] law enforcement officers may stop and search a vehicle without a warrant if they have probable cause to believe it is carrying contraband or other evidence that is subject to seizure under the law. *United States v. Stephenson*, 452 F.3d 1173, 1177 (10th Cir. 2006) ("Probable cause to search a vehicle exists if, under the totality of the circumstances, a fair probability exists that

---

[4] Fourth Amendment protection applies to state law enforcement. *See Mapp v. Ohio*, 367 U.S. 643, 655-56 (1961) (incorporating the Fourth Amendment's provisions against the states through the Fourteenth Amendment).

the vehicle contains contraband or other evidence which is subject to seizure under the law." (quotations omitted)); *see also Florida v. Harris*, 568 U.S. 237, 243 (2013) ("A police officer has probable cause to conduct a search when the facts available to him would warrant a person of reasonable caution in the belief that contraband or evidence of a crime is present." (brackets and quotations omitted)); *United States v. Chavez*, 534 F.3d 1338, 1343 (10th Cir. 2008) ("[P]olice may stop a car if they have probable cause . . . to believe the car is carrying contraband."). An officer with probable cause may "search the entire vehicle, including the trunk and all containers therein that might contain contraband." *Chavez*, 534 F.3d at 1345 (quotations omitted).

   c. *Collective knowledge doctrine*

Under the collective knowledge doctrine, the officer who makes a stop or conducts a search need not have reasonable suspicion or probable cause. Instead, the reasonable suspicion or probable cause of one officer can be imputed to the acting officer. *See United States v. Whitley*, 680 F.3d 1227, 1234 (10th Cir. 2012); *Chavez*, 534 F.3d at 1345-47 (citing *United States v. Zamudio-Carrillo*, 499 F.3d 1206 (10th Cir. 2007) and our sibling circuits to hold that law enforcement's collective probable cause to search a vehicle extended to the executing officer and permitted a warrantless search of locations in the vehicle that might contain the contraband). In other words, "[w]here one officer knows facts constituting reasonable suspicion or probable cause (sufficient to justify action under an exception to the warrant requirement), and he communicates an appropriate order or request, another officer

may conduct a warrantless stop, search, or arrest without violating the Fourth Amendment." *United States v. Ramirez*, 473 F.3d 1026, 1037 (9th Cir. 2007); *see Chavez*, 534 F.3d at 1347 (quoting *Ramirez*).

The collective knowledge doctrine can be horizontal or vertical. "Under the vertical collective knowledge doctrine, an arrest or stop is justified when an officer having probable cause or reasonable suspicion instructs another officer to act, even without communicating all of the information necessary to justify the action." *Whitley*, 680 F.3d at 1234.[5] Thus, we consider only whether the officer requesting the stop had probable cause, not whether the officer conducting the search independently had probable cause. *See id.*

2. **Analysis**

When Kansas law enforcement requested the Nebraska Highway Patrol to stop Mr. Pickel, Kansas law enforcement had probable cause to stop and search his truck. Its request imputed that probable cause to Nebraska Highway Patrol under the collective knowledge doctrine. Nebraska Highway Patrol Trooper Frazey's search of the truck was therefore permissible under the Fourth Amendment. The following testimony from the suppression hearing described the investigative team's probable cause basis:

---

[5] "Under the horizontal collective knowledge doctrine, a number of individual officers have pieces of the probable cause or reasonable suspicion puzzle, but no single officer has sufficient information to satisfy the necessary standard." *United States v. Whitley*, 680 F.3d 1227, 1234 n.3 (10th Cir. 2012). The horizontal collective knowledge doctrine is not at issue in this case.

- Intercepted calls showed Mr. Pickel was communicating with Los and Roosevelt, and other members of the drug distribution network. ROA, Vol. II at 3134.

- Intercepted calls showed Los Dahda sent Mr. Pickel to California to set up a residence and high-grade marijuana grow operation funded by Los Dahda. *Id.* at 3134-36; *see also Los Dahda*, 853 F.3d at 1108.

- Intercepted calls showed Mr. Pickel hosted Roosevelt Dahda at his California residence. ROA, Vol. II at 3135-36.

- In "initial investigations," Kansas law enforcement received information and confirmed that Mr. Bauman had a false compartment in his pickup truck. *Id.* at 3137.

- Physical surveillance by officers showed auxiliary fuel tanks in the back of Los Dahda's vehicle and Mr. Pickel's vehicle. *Id.* at 3137-38. Intercepted phone conversations led Kansas law enforcement to have "probable cause to believe the tanks had false compartments in them and they were used for narcotics distribution." *Id.* at 3138-39.

- On March 26, 2012, Utah Highway Patrol randomly stopped Mr. Rector, an alleged co-conspirator in the drug distribution network, and discovered he had a false compartment in his tank with high-grade marijuana inside. *Id.* at 3142. Kansas Detective McAtee testified this discovery confirmed law enforcement's suspicions that the auxiliary tanks in trucks owned by other co-conspirators were modified to contain hidden compartments. *Id.* at 3146, 3174.

- On April 17, 2012, intercepted calls showed that Los and Roosevelt Dahda discussed sending marijuana from California to Kansas through Mr. Pickel. *Id.* at 3149, 3176.

- Intercepted calls identified Mr. Mussat as a customer. One of the calls, on April 24, 2012, revealed that he had requested five pounds of marijuana. Roosevelt Dahda responded that his "guy's en route" and called Mr. Pickel to convey the request. Mr. Pickel agreed he could change direction and "shoot south." *Id.* at 3149-52.

- Kansas law enforcement conducted GPS tracking of Mr. Pickel's location through his cell phone, which showed he left California on April 23, 2012 and was in Cheyenne, Wyoming on April 24, 2012. *Id.*

at 3150-51.

- On April 25, 2012, Kansas law enforcement observed Mr. Pickel's vehicle on Interstate 80, confirmed he had an auxiliary fuel tank on the back of the pickup truck, and followed his vehicle for at least three hours. *Id.* at 3133, 3153-55.

- Kansas law enforcement, concerned they would lose the vehicle because of oncoming darkness and traffic, called Nebraska Highway Patrol to arrange a vehicle stop based on independent reasonable suspicion. *Id.* at 3156-57. Kansas Detective McAtee and Kansas Sergeant McLaren told Nebraska Highway Patrol Sergeant Salmen that Mr. Pickel was being investigated for narcotics, that he was driving from California, and that officers believed there was high-grade marijuana in his vehicle. *Id.* at 3157-58.

- Sergeant Salmen conveyed Detective McAtee and Sergeant McLaren's request to Nebraska Highway Patrol Trooper Frazey and explained there was a "high probability that [the truck] was transporting illegal contraband." *Id.* at 3221-22.

- Trooper Frazey pulled Mr. Pickel over for a traffic violation, and because the truck had "overwidth tires" without splash guards, in violation of Nebraska law. *Id.* at 3224-26. Trooper Frazey saw that the truck bed contained an auxiliary fuel tank. *Id.* at 3227. He issued Mr. Pickel a warning for the traffic and equipment violations. *Id.* at 3232-33. Mr. Pickel agreed to answer more questions, but when conversation turned to drugs, his level of nervousness elevated. *Id.* at 3238. Mr. Pickel declined Trooper Frazey's request to search the truck. *Id.* at 3233. Trooper Downing deployed his dog, and the dog alerted to the presence of drugs. *Id.* at 3235-36. Trooper Frazey found personal marijuana in the truck, towed the truck from the interstate, searched it, and found approximately 37 pounds of high-grade marijuana in the auxiliary fuel tank. *Id.* at 3237, 3242-46.

Viewing these facts in the light most favorable to the Government, Kansas law enforcement, including Detective McAtee and Sergeant McLaren, had probable cause to believe Mr. Pickel's truck was carrying high-grade marijuana. From the intercepted calls, physical surveillance, and corroboration provided by Mr. Rector's

- 13 -

traffic stop, Kansas law enforcement had probable cause to stop and search Mr. Pickel's truck because, under the totality of the circumstances, there was a fair probability that the car contained contraband.

Based on that probable cause, Detective McAtee and Sergeant McLaren asked Nebraska Highway Patrol to stop and search Mr. Pickel's vehicle, explaining there was a "high probability that it was transporting illegal contraband." *Id.* at 3221-22. Sergeant Salmen directed Trooper Frazey to execute that order. Under the collective knowledge doctrine, Trooper Frazey "acted on the strength of [Kansas law enforcement's] probable cause when he stopped and searched [Mr. Pickel's] truck." *Chavez*, 534 F.3d at 1348. As in *Chavez*, Trooper Frazey "merely supplied a cover story [(the traffic violations)] that would mask the basis for his alternative probable cause[,]" a valid law enforcement tactic calculated to safeguard the investigation's integrity. *Id.* Trooper Frazey could thus search Mr. Pickel's entire vehicle, including the auxiliary fuel tank, without violating the Fourth Amendment. *Id.* at 1345 ("Once the officer's suspicions rise to the level of probable cause, they are empowered to search the entire vehicle, including the trunk and all containers therein that might contain contraband." (quotations omitted)).

### B. *Sufficiency of Conspiracy Evidence (Count 1)*

Mr. Pickel argues there was insufficient evidence at trial to support the jury's conspiracy conviction. We disagree.

1. **Legal Background**

    a. *Sufficiency of the evidence*

"To review sufficiency of the evidence, we engage in de novo review, considering the evidence in the light most favorable to the government to determine whether any rational jury could have found guilt beyond a reasonable doubt." *Los Dahda*, 853 F.3d at 1106; *see also United States v. Hutchison*, 573 F.3d 1011, 1033 (10th Cir. 2009). "[W]e consider all of the evidence, direct and circumstantial, along with reasonable inferences[,]" but "we do not weigh the evidence or consider the relative credibility of witnesses." *Los Dahda*, 853 F.3d at 1106; *see also United States v. Bowen*, 527 F.3d 1065, 1076 (10th Cir. 2008). Thus, our review of the evidence is "highly deferential." *Bowen*, 527 F.3d at 1076 (quotations omitted). "[W]e may reverse only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. (quotations omitted)

    b. *Elements of the crime*

To prove a conspiracy, the government must show that: "(1) two or more persons agreed to violate the law, (2) [the defendant] knew the essential objectives of the conspiracy, (3) [the defendant] knowingly and voluntarily participated in the conspiracy, and (4) the alleged co-conspirators were interdependent." *Los Dahda*, 853 F.3d at 1107; *see also United States v. Caldwell*, 589 F.3d 1323, 1329 (10th Cir. 2009). Proof of these elements tends to overlap. Mr. Pickel's challenges concern the third and fourth elements.

Regarding participation, the third element, the government must prove "that the defendant had knowledge of the conspiracy and voluntarily participated therein." *United States v. Evans*, 970 F.2d 663, 669 (10th Cir. 1992). Proving participation therefore requires both (1) knowledge of the conspiracy, which overlaps with the second conspiracy element, and (2) voluntary participation in that conspiracy.

To satisfy the first part of proving participation, the evidence must "show that the defendant shared a common purpose or design with his alleged coconspirators." *United States v. Hamilton*, 587 F.3d 1199, 1206 (10th Cir. 2009) (quotations omitted). "[W]e have recognized that because a criminal conspiracy by its very nature is usually shrouded in a further conspiracy of silence, the common plan or purpose must often be, and may legitimately be, proved by circumstantial evidence." *Id.* (quotations omitted). A conspirator "need not know of the existence or identity of the other members of the conspiracy or the full extent of the conspiracy, but he or she must have a "general awareness of both the scope and the objective of the enterprise to be regarded as a coconspirator." *Evans*, 970 F.2d at 669-70 (citations and quotations omitted). Thus, merely associating with known criminal conspirators or purchasing drugs for personal use is insufficient to prove participation in a conspiracy; rather, the defendant's participation must share a common purpose or design with his co-conspirators. *United States v. Fox,* 902 F.2d 1508, 1514 (10th Cir.

1990); *United States v. Dickey*, 736 F.2d 571, 585 (10th Cir. 1984); *see also United States v. Rivera-Carrera*, 386 F. App'x 812, 815 (10th Cir. 2010) (unpublished).[6]

To satisfy the second part of proving participation, the evidence need only show that the defendant played a minor role in the conspiracy to make him a co-conspirator. *United States v. Small*, 423 F.3d 1164, 1182 (10th Cir. 2005); *United States v. Johnston*, 146 F.3d 785, 789 (10th Cir. 1998) ("The defendant's participation in or connection to the conspiracy need only be slight, so long as sufficient evidence exists to establish the defendant's participation beyond a reasonable doubt."). The jury need not find that "the conspiracy could not have functioned without [the defendant]; rather, it is sufficient that [the defendant] was an operational link within it." *United States v. Cornelius*, 696 F.3d 1307, 1318 (10th Cir. 2012). As we explained in *Los Dahda*, "we have recognized the sufficiency of evidence on a large drug conspiracy when various individuals perform assigned tasks involving the transportation and sale of illegal drugs." 853 F.3d at 1110; *see also United States v. Roosevelt Dahda* (*Roosevelt Dahda*), 852 F.3d 1282, 1289 (10th Cir. 2017) (citing *United States v. Anaya*, 727 F.3d 1043, 1051 (10th Cir. 2013), and explaining that a defendant may be found to participate in a drug conspiracy merely by installing hidden compartments in vehicles).

---

[6] Although not precedential, we find the reasoning of this unpublished case instructive. *See* 10th Cir. R. 32.1 ("Unpublished decisions are not precedential, but may be cited for their persuasive value."); *see also* Fed. R. App. P. 32.1.

Regarding interdependence, the fourth conspiracy element, the evidence must show the "coconspirators intend[ed] to act together for their shared mutual benefit within the scope of the conspiracy charged." *Caldwell*, 589 F.3d at 1329 (brackets and quotations omitted); *see also United States v. Acosta-Gallardo*, 656 F.3d 1109, 1124 (10th Cir. 2011). It may be shown when a defendant's activities "facilitated the endeavors of other alleged co-conspirators or facilitated the venture as a whole." *Acosta-Gallardo*, 656 F.3d at 1124 (quotations omitted). "[O]f principal concern is whether the activities of alleged co-conspirators in one aspect of the charged scheme were necessary or advantageous to the success of the activities of co-conspirators in another aspect of the charged scheme, or the success of the venture as a whole." *United States v. Daily*, 921 F.2d 994, 1007 (10th Cir. 1990), *overruled on other grounds by United States v. Gaudin*, 515 U.S. 506 (1995); *United States v. Carnagie*, 533 F.3d 1231, 1240 (10th Cir. 2008) (quoting *Daily*). When reviewing a jury's determination that a single conspiracy existed, interdependence among co-conspirators is "a focal point of the analysis." *Caldwell*, 589 F.3d at 1329 (quotations omitted). Interdependence can be established by circumstantial evidence alone, and "a single act can be sufficient to demonstrate interdependence." *Id*.

2. **Analysis**

Mr. Pickel argues the evidence at trial was insufficient to support his conspiracy conviction for three reasons. Each of his arguments fails.

First, Mr. Pickel argues the evidence showed there were multiple conspiracies between many defendants, rather than a single common purpose or objective among

- 18 -

the co-conspirators. But we concluded in *Los Dahda* and *Roosevelt Dahda*, the appeals of his two co-defendants, that "the evidence [at trial] was sufficient to permit the finding of a single conspiracy of 1,000 kilograms or more of marijuana." 853 F.3d at 1107; 852 F.3d at 1288.[7] Applying the same reasoning underlying that conclusion here, we reject Mr. Pickel's first argument.

Second, Mr. Pickel argues the evidence was insufficient to establish his participation in the conspiracy. He contends the evidence established that his involvement was only to grow indoor marijuana in his home, financed by the Dahdas, but that he did not share the objective of the conspiracy to possess with intent to distribute over 1,000 kilograms of marijuana. He argues there was no evidence "that he bought or sold any marijuana except from Jeffrey Paiva, and then only for his personal use,"[8] or that he knew most of the other co-conspirators. Aplt. Br. at 20-21. But a rational jury could find that evidence at trial showed the following:

---

[7] The superseding indictment also alleged conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine, but this charge was never submitted to the jury, and Mr. Pickel was not convicted of it. ROA Vol. 1 at 583 (Mr. Pickel stated in his Objections to the PSR that "the cocaine allegation in Count 1 of the superseding indictment was abandoned by the government with regard to Mr. Pickel and never submitted to the jury."); *see also Los Dahda*, 853 F.3d at 1110 ("Though count one charged a conspiracy involving cocaine, this part of the conspiracy was not submitted to the jury.").

[8] Even if true, Mr. Pickel's argument that he did not buy or sell marijuana is inapposite because—as explained above—co-conspirators in a drug conspiracy may perform different roles involving the transportation and sale of the drugs. *See Los Dahda*, 853 F.3d at 1110; *see also Roosevelt Dahda*, 852 F.3d at 1289 (citing *United States v. Anaya*, 727 F.3d 1043 (10th Cir. 2013)).

1. Mr. Pickel assisted the drug distribution network with marijuana-related tasks, including collecting payments, directing transactions, and packaging for transport.[9]

2. He set up and maintained an indoor marijuana grow operation in California.[10] Los and Roosevelt Dahda financed the operation, and Mr. Pickel received advice and help from two other co-conspirators at the direction of Los Dahda.[11]

---

[9] *See, e.g.*, ROA, Vol. I at 1106 (Detective McAtee testified that he believed Government's Exhibit 762, a phone call recording, showed "Justin Pickel was directing David Essman to meet an individual in Lawrence to facilitate a drug deal" and that "Justin Pickel was going to pay Sadie Brown . . . a commission for her assistance arranging or facilitating the narcotics trafficking."); *id.*, Vol. II at 752 (Samuel Villeareal testified that Mr. Pickel came to "pick[] up money" from his residence in Kansas.); *id.* at 2159-2161 (Phillip Alarcon testified that "[a]ny time they were needing marijuana packaged, Pickel would be involved in it," and that Mr. Pickel was "involved in that packaging process" at Mr. Alarcon's house in California.); *id.* at 2190-91 (Mr. Alarcon testified that Mr. Pickel "brought packaging supplies to [his] house [in California] on a couple occasions."); *id.* at 2288-92 (Mr. Alarcon testified that Mr. Pickel "came to [his] house sometimes and, you know, packaged marijuana, things of that nature," that he saw Mr. Pickel packing marijuana at "the warehouse maybe once or twice . . . . I can't give you a date but he was there. He assisted, he helped out," that he saw Mr. Pickel at the warehouse "vacuum sealing boxes, packaging, doing the normal procedure they do to package the marijuana," and that Mr. Pickel brought "vacuum sealed bags, . . . [a] vacuum sealer, [and] tape" in a duffel bag to store at Alarcon's home.); *id.*, Vol. I at 1615 (Detective McAtee testified that based on several intercepted calls "it's reasonable to believe that Justin Pickel directed David Essman to meet with Sadie Brown to obtain marijuana which he had ordered from Sadie Brown which is ultimately distributed.").

[10] *Id.* at 2017-18 (Detective Randa testified that there was "evidence of an active marijuana grow" at Mr. Pickel's residence.).

[11] *Id.*, Vol. II at 649-50 (Mr. Paiva testified that he assisted Mr. Pickel in starting up the process of a grow operation.); *id.* at 712 (Mr. Paiva testified that Los Dahda "asked [him] to give [Mr. Pickel] some pointers [about marijuana growing]."); *id.* at 2179-80 (Mr. Alarcon testified that he went to Mr. Pickel's house "to help his grow there" "[o]ut of friendship of Los Dahda trying to help him out."); *id.* at 2322-25 (Mr. Alarcon testified that Los Dahda "asked [him] to kind of guide Mr. Pickel on how to start this grow operation" and that Los Dahda was paying for the grow

Continued . . .

3. He transported approximately 37 pounds of marijuana from California to the Midwest at the Dahdas' direction before law enforcement seized it.[12] Like other members of the conspiracy, he used a false compartment in an auxiliary fuel tank of his pickup truck.[13]

---

operation.); *id.*, Vol. I at 1669-70 (Detective McAtee, summarizing calls, testified that there were conversations with Justin Pickel informing Los Dahda about how he was building the grow and which plants he was purchasing, showing Los Dahda was aware of "what was going on with" Mr. Pickel's grow operation.). *See also Los Dahda*, 853 F.3d at 1108 (finding evidence that "Los funded a grow operation in California that was run by a co-defendant, Mr. Justin Pickel" and that "[a]pproximately 200 marijuana plants were later found at Mr. Pickel's residence"); *Roosevelt Dahda*, 852 F.3d at 1288 (finding evidence that "Roosevelt sent boxes through the group's shipping operation to Mr. Justin Pickel, who grew marijuana in California. . . .  Roosevelt also agreed to send money to Mr. Pickel.").

[12] ROA, Vol. I at 1232-33 (Detective McAtee testified that "marijuana [was] found in the auxiliary fuel tank of Justin Pickel's pickup" after his vehicle was stopped in Nebraska.); *id.* at 2146 (Trooper Frazey testified that on the night of the traffic stop Mr. Pickel's truck had an "auxiliary fuel tank . . . in the back of the pickup."); *id.* at 2154 (Trooper Frazey testified that the "concealment compartment" in Mr. Pickel's truck contained a total of "35 packages weighing just over 37 pounds . . . ."); *id.*, Vol. II at 2201-02 (Mr. Alarcon testified that Mr. Pickel left California with marijuana loaded in his vehicle, that Mr. Pickel was pulled over in Nebraska, and that law enforcement "found marijuana in the hidden compartment."). *See also Roosevelt Dahda*, 852 F.3d at 1288-89 (finding evidence that "[t]he day after the police seized approximately 37 pounds of marijuana from Mr. Pickel, Roosevelt and Los [Dahda] discussed the fact that they had lost half of what they had worked for and that they had to be cautious when bringing the rest of this back." (brackets and quotations omitted)).

[13] ROA, Vol. II at 2133 (Mr. Alarcon testified that Chad Bauman had an auxiliary fuel tank "with hidden compartments to store marijuana and cash" for transport "to and from Kansas," and the Dahdas had two trucks with those fuel tanks.); *id.* at 2144 (Mr. Alarcon testified that "[w]e'd package [the marijuana] and seal it and we'd ship either by tank at the smaller amounts but then we started shipping in the crates."); *id.* at 2167-68 (Mr. Alarcon testified that Los Dahda "didn't want to have to [stop using crates and] start driving [marijuana] in tanks . . . because he could only drive half of what he was probably trying to ship in a tank and storage tank and he didn't want to do that."); *id.* at 2457 (Mr. Bauman testified that similar tanks were built for him, Los Dahda, Wayne Swift, and Mr. Pickel.); *id.* at 2460 (Mr.

Continued . . .

- 21 -

Viewing this evidence in the light most favorable to the Government, we conclude that a rational trier of fact could find beyond a reasonable doubt that Mr. Pickel knowingly and voluntarily participated in the conspiracy. *See United States v. Caro*, 965 F.2d 1548, 1556 (10th Cir. 1992) (holding that a defendant's delivery of large quantities of drugs provides circumstantial evidence that he was a co-conspirator and not merely a customer of the conspiracy); *United States v. Horn*, 946 F.2d 738, 743 (10th Cir. 1991) (holding that when a defendant agreed to bring in customers and deliver drugs, the "defendant became part of the larger common plan to distribute" cocaine and was thus a co-conspirator). Even if Mr. Pickel did not know or interact with many of his co-conspirators, a reasonable jury could find from the trial evidence that he knew the scope and objective of the conspiracy—to possess and distribute marijuana for profit—and participated in that common plan or purpose in various ways. *See Evans*, 970 F.2d at 669-70.

Third, Mr. Pickel argues there was insufficient evidence to establish that he operated interdependently with the other co-conspirators. He contends his indoor grow operation was not integral to the conspiracy and that he had difficulty growing marijuana indoors. He also points out that only 37 kilograms of marijuana was attributed to him at sentencing from the April 25, 2012 traffic stop and the June 13, 2012 search of his residence. But a rational jury could find that evidence at trial showed the following:

Bauman testified that he and Wayne Swift would "drive money out to California" by using "[o]ne of the trucks with the tank.").

- 22 -

1. As described above, Mr. Pickel willingly participated in the conspiracy by performing a variety of roles and expressed that other co-conspirators' successes were advantageous to him.[14]

2. The Dadhas' phone conversations the day after police seized marijuana from Mr. Pickel's truck showed that Mr. Pickel's contributions significantly affected the rest of the drug distribution network.[15]

---

[14] *See also id.*, Vol. I at 1149 (Detective McAtee characterized Government's Exhibit 795 as a conversation between Mr. Pickel and Los Dahda: "I believe the conversation that Justin Pickel talked about that he wanted to be a productive part of our business was indication of them working together."); Suppl. ROA at Gov. Exh. 855 (Mr. Pickel told Roosevelt Dahda, "I can do what you need me to do. You know what I mean? . . . [I]t's whatever you want dog, you know what I mean, no bulls--- . . . . I'll do whatever you want man . . . . [I]t's not even my money it's your money but f--- you know what I mean the way s--- goes I probably need it more than you do or use it more than you do or something, whatever you need to do dog . . . . I could shoot south at that point and it would not be crazy out of the way . . . it's out of the way you know what I mean but f--- it really you know what I'm saying, whatever you need done for real, no big s--- so just decide."); ROA, Vol. I at 1215 (Detective McAtee characterized Government's Exhibit 855 as a conversation between Mr. Pickel and Roosevelt Dahda: "Justin Pickel indicated that he . . . would be able to change what he was doing . . . [to] take a different route and then drive down and meet Domenic Mussat in regards to the possibility of providing five pounds of high-grade marijuana to him.").

[15] Suppl. ROA at Gov. Exh. 860 (Los Dahda told Roosevelt Dahda about Mr. Pickel's seizure stating, "I don't know sorry about last night . . . I don't know we just lost half of what we worked for so you know we'll run like conservative status and then like obviously we are not going to be able to bring the rest of this back so I just going to try and get what I got for it here . . . . I mean I don't know, think there is going to be a way for me to figure out how to get it back. I am still trying but you know I'm a little shy after what just happened."); ROA, Vol. I at 1235 (Detective McAtee characterized Government's Exhibit 860 as a "guarded conversation in regards to the auxiliary fuel tank, that type of compartment, they would not be able to use it."); *id.* at 1244-45 (Detective McAtee characterized Government's Exhibits 863-65, stating, "[t]here was indication that Roosevelt Dahda was trying to get money for a situation [which he believed to] . . . relate back to the Justin Pickel situation" from the traffic stop.).

The success of drug distribution networks often depends on different members performing a variety of roles. *Dickey*, 736 F.2d at 582 ("Even the remote members of the conspiracy [are] undeniably dependent on the success of each transaction to ensure the continuing prosperity of the overall scheme. The success of each transaction was essential to attain ultimate goal of profitability."). Mr. Pickel's roles—collecting payment, directing transactions, packaging marijuana, transporting marijuana, and growing marijuana—were material to the continuing success of the conspiracy even if some were relatively minor. It is irrelevant that his grow operation underperformed or that he did not participate in other acts of the conspiracy. *United States v. Yehling*, 456 F.3d 1236, 1241 (10th Cir. 2006); *United States v. Bridgeman*, 523 F.2d 1099, 1107-08 (D.C. Cir. 1975). Even if Mr. Pickel had a minor role in the conspiracy compared to others, the evidence was sufficient for a rational jury to conclude beyond a reasonable doubt that he played an interdependent role. *See Cornelius*, 696 F.3d at 1318.

## C. *Variance in Conspiracy Evidence*

Mr. Pickel argues there was a prejudicial variance between the single conspiracy charged in Count One of the superseding indictment and the trial evidence, which he contends established only multiple, smaller conspiracies.

"In the context of a conspiracy conviction, we treat a variance claim as a challenge to the sufficiency of the evidence establishing that each defendant was a member of the same conspiracy." *Los Dahda*, 853 F.3d at 1111 (quoting *United*

- 24 -

*States v. Gallegos*, 784 F.3d 1356, 1362 (10th Cir. 2015)). Viewing the challenge in this manner, our review is de novo. *Id.*

Because we found above that the trial evidence was sufficient for a rational jury to conclude beyond a reasonable doubt that Mr. Pickel participated in a single conspiracy—as charged in the indictment—Mr. Pickel's variance claim fails. We rejected the same variance challenge by both of Mr. Pickel's co-defendants in *Los Dahda*, 853 F.3d at 1111, and *Roosevelt Dahda*, 852 F.3d at 1290.

D. ***Sufficiency of Communication Device Evidence (Count 70)***

Mr. Pickel argues there was insufficient evidence at trial to support the jury's conviction regarding his use of a communication device to facilitate a drug trafficking felony. We disagree.

1. **Legal Background**

a. *Sufficiency of the evidence*[16]

As explained above, to review sufficiency of the evidence "we engage in de novo review, considering the evidence in the light most favorable to the government to determine whether any rational jury could have found guilt beyond a reasonable doubt." *Los Dahda*, 853 F.3d at 1106.

_____

[16] Mr. Pickel did not move for acquittal below on Count 70, which would ordinarily result in plain error review. But we typically review the sufficiency claim as if it had been raised below because the applicable standard is essentially the same as plain error. *United States v. Rufai*, 732 F.3d 1175, 1189 (10th Cir. 2013); *United States v. Bowie*, 892 F.2d 1494, 1496-97 (10th Cir. 1990). Moreover, because we determine the evidence was sufficient to support Mr. Pickel's conviction—resulting in no error—the challenge would fail at step one of plain error review. *See Rufai*, 732 F.3d at 1189 (setting forth four steps of plain error review).

- 25 -

b.  *Elements of the crime*

21 U.S.C. § 843(b) prohibits the knowing or intentional use of a phone to facilitate a drug trafficking felony.  It states, in relevant part:

> It shall be unlawful for any person knowingly or intentionally to use any communication facility in committing or in causing or facilitating the commission of any act or acts constituting a felony under any provision of this subchapter or subchapter II of this chapter.  Each separate use of a communication facility shall be a separate offense under this subsection.  For purposes of this subsection, the term "communication facility" means any and all public and private instrumentalities used or useful in the transmission of writing, signs, signals, pictures, or sounds of all kinds and includes mail, telephone, wire, radio, and all other means of communication.

*Id.*

To obtain a conviction under § 843(b), the government must prove the defendant: (1) knowingly or intentionally (2) used a telephone or other communications facility (3) to commit, cause or facilitate any act constituting a drug felony.  *Acosta-Gallardo*, 656 F.3d at 1121.  "Thus, there are *two* conduct elements that the government must prove: first that the defendant used a communication facility, and second, that in doing so, the defendant committed, facilitated, or caused to be committed a drug felony."  *Id.*  To prove "facilitation," the government must show that "the use of the communication facility, a telephone in this case, made the commission of the offense easier."  *United States v. McIntyre*, 836 F.2d 467, 473 (10th Cir. 1987).

We have held that "inchoate crimes such as attempt and conspiracy qualify as drug felonies that may underlie a Section 843(b) offense." *Acosta-Gallardo*, 656 F.3d at 1122.

2. **Analysis**

Mr. Pickel argues the evidence at trial was insufficient to support his conviction on Count 70 for three reasons. Each argument fails.

First, Mr. Pickel argues the Government's only evidence on this count was the April 24, 2012 intercepted phone call between him and Roosevelt Dahda, and that this was not enough to sustain his conviction. But evidence that Mr. Pickel used his phone—even once—to facilitate the conspiracy was sufficient. Section 843(b) states that "[e]ach separate use of a communication facility shall be a separate offense under this subsection." Count 70 in the superseding indictment is only for the date of April 24, 2012.[17] The evidence at trial showed the following:

- Mr. Pickel was driving a shipment of marijuana in his auxiliary fuel tank from California toward the Midwest.[18]

---

[17] Other individual phone calls were charged in separate counts.

[18] ROA, Vol. I at 1229, 1232 (Detective McAtee testified that officers tracked Mr. Pickel's phone via GPS as it traveled on Interstate 80 from California and that law enforcement believed he was "coming to the state of Kansas and based on the calls between Roosevelt Dahda and Domenic Mussat and the earlier phone calls . . . that there was high-grade marijuana in Justin Pickel's vehicle and [] believed that it would be hidden in the false compartment in the auxiliary fuel tank that he had in the back of his pickup truck" and that after Mr. Pickel was stopped, marijuana was found in the auxiliary fuel tank of his pickup.).

- Mr. Pickel and Roosevelt Dahda spoke on the phone about a possible delivery of five pounds of marijuana to Mr. Dahda's customer in Kansas.[19]

- Mr. Pickel said he would do "whatever" Roosevelt Dahda needed him to do, including changing his driving direction, and asked if he would be making the delivery alone.[20]

From this evidence a rational jury could conclude beyond a reasonable doubt that

Mr. Pickel knowingly used his phone to facilitate distribution of marijuana in furtherance

---

[19] Suppl. ROA at Gov. Exh. 853 (Mr. Mussat requested, "Yeah man I mean I can get, I'll get 5," and Roosevelt Dahda responded, "All right let me hit you right back."); *id.* at Gov. Exh. 854 (Roosevelt Dahda told Mr. Mussat, "I'm going to hit you back here in a little bit . . . I just, my dude's have called me and they, and they're asking me f---ing if I need anything taken there for me . . . . So I was trying to figure . . . . I'll hit you back here in a little, in a few hours."); *id.* at Gov. Exh. 855 (Mr. Pickel called Roosevelt Dahda and said, "I could shoot south at that point and it would not be crazy out of the way or I could just keep going it, its out of the way . . . no big s--- so just decide."); ROA, Vol. I at 1214-16 (Detective McAtee testified that Government's Exhibits 853-55 showed that "Domenic Mussat indicated he would like to get five, which . . . I believed that it indicates that he was wanting five pounds of high-grade marijuana. And then as the call continued, Roosevelt Dahda indicated that he was in contact with an individual and that once he was able to speak to, quote, his dude . . . that Roosevelt Dahda would be in contact with Domenic Mussat to see if there would be a possibility that he could provide him with five pounds of high-grade marijuana . . . . [Then] Roosevelt Dahda and Justin Pickel discuss[ed] what I believe to be the earlier phone call in reference to Domenic Mussat wanting to obtain high-grade marijuana. Justin Pickel indicated that he—he would be able to change what he was doing, which we believe . . . was traveling from California in his vehicle . . . [and] take a different route and then drive down and meet Domenic Mussat in regards to the possibility of providing five pounds of high-grade marijuana to him . . . . [in] Wichita, Kansas.").

[20] Suppl. ROA at Gov. Exh. 855 (Mr. Pickel responded to Roosevelt Dahda saying, "I can do what you need me to do. You know what I mean? It's just f---ing ah, it's whatever you want dog, you know what I mean, no bull---. . . . I'll do whatever you want man. . . . whatever you need to do dog you have, you have until tomorrow basically . . . to decide . . . it[']s out of the way you know what I mean but f--- it really you know what I'm saying, whatever you need done for real, no big s--- so just decide. . . . Um, do you think you are going to come meet me up there or am I going to, am I going to f---ing be representative of, that is my first question?").

of the conspiracy. *See United States v. Reese*, 775 F.2d 1066, 1075 (9th Cir. 1985) (finding sufficient evidence to support a § 843(b) conviction because "[e]ach of the charged telephone calls involved prospective narcotics transactions, and [the defendant] willingly participated in each of them for the purpose of furthering his unlawful narcotics trade").

Second, Mr. Pickel argues he did not knowingly or intentionally make the call to facilitate the conspiracy because he had already passed the exit to go to Kansas when he was pulled over, and the evidence at trial did not establish where he was going in his truck. But completion of the specific transaction underlying the call is not an element of the offense. The inquiry is whether the call facilitated the conspiracy, not whether it facilitated the particular transaction. *See McIntyre*, 836 F.2d at 473.[21] Here, the phone call facilitated the offense of conspiring to possess and distribute marijuana for profit because it involved a conversation between co-conspirators to alter arrangements for marijuana distribution.

---

[21] Mr. Pickel relies on *United States v. Biglow*, 554 F. App'x 679, 683-84 (10th Cir. 2014) (unpublished), a factually inapposite non-precedential case. In *Biglow*, the defendant called a co-conspirator seeking to purchase cocaine, but the co-conspirator refused. *Id.* at 683. We reversed the § 843(b) conviction under an attempt-to-possess theory because the co-defendant's refusal to sell cocaine could not facilitate the conspiracy to possess with the intent to distribute cocaine, and the relevant jury instruction did not list an attempt crime as a possible predicate offense. *Id.*

Here, Mr. Pickel already possessed marijuana in his auxiliary fuel tank when he called Roosevelt Dahda. Roosevelt Dahda's instruction to deliver, or not deliver, the drugs to Mr. Mussat managed the distribution of the conspiracy's marijuana. The evidence was sufficient for a rational jury to find the call facilitated the "conspir[acy] . . . to possess with intent to distribute . . . marijuana" charged in the superseding indictment. ROA, Vol. I at 108.

<u>Third</u>, Mr. Pickel vaguely argues § 843(b) "requires mens rea" and there was no evidence to show he knew he was transporting marijuana. Aplt. Reply Br. at 23. But he makes this argument for the first time in his reply brief, and it is therefore waived. *See Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772, 783 (10th Cir. 2006) ("[T]he failure to raise an issue in an opening brief waives that issue . . . . Consistent with these principles is the general rule that appellate courts will not entertain issues raised for the first time on appeal in an appellant's reply brief." (quotations omitted)).[22]

Viewing the evidence in the light most favorable to the Government, a rational jury could have found beyond a reasonable doubt that Mr. Pickel knowingly used his phone to facilitate the drug conspiracy.

---

[22] Even if Mr. Pickel's mens rea argument were not waived, he acknowledges that the underlying crime for the § 843(b) offense is the conspiracy. *See* Aplt. Br. at 41 (stating that the underlying crime was "the offense charged in Count 1, namely conspiracy to possess with intent to distribute marijuana"). Mr. Pickel knowingly used his phone and knowingly agreed to complete the marijuana delivery to Mr. Mussat on that phone.

### E. *Supervised Release Term*

Mr. Pickel argues in his opening brief that his 10-year term of supervised release exceeds the statutory maximum set forth in 21 U.S.C. § 841(b)(1)(D). But Mr. Pickel correctly concedes in his reply brief that his claim of error is meritless because § 841(b)(1)(D) requires a minimum two-year term for his conviction and imposes no statutory maximum.[23]

Mr. Pickel also argues for the first time in his reply brief that, despite his erroneous reading of § 841, the district court erred by not considering the factors set forth in 18 U.S.C. § 3553(a) to determine an appropriate length of supervised release.[24] But this argument is waived, *see id.*, and we decline to consider it.

### F. *Joint and Several Forfeiture Liability*

Mr. Pickel argues the district court violated 21 U.S.C. § 853(a) by making Mr. Pickel jointly and severally liable for a $16,985,500 criminal forfeiture money judgment based on the value of marijuana attributable to the full conspiracy. In a Rule 28(j) letter to this court, the Government conceded this was error under the Supreme Court's recent decision in *Honeycutt v. United States*, No. 16-142, slip op.

---

[23] Reviewing the district court's interpretation of a statute de novo, we stated in *United States v. Handley*, 678 F.3d 1185, 1189 (10th Cir. 2012), that "it is . . . clear under the plain language of § 841(b)(1)(B) that the maximum term of supervised release is life. This is because the statute does not expressly limit the maximum allowable term of supervised release a court may impose."

[24] Mr. Pickel states the court should have considered the factors set forth in "18 U.S.C. § 3552(a)." *See* Aplt. Reply Br. at 19. Because 18 U.S.C. § 3552 is not relevant to the issues on appeal, we understand his argument to refer to 18 U.S.C. § 3553(a).

(June 5, 2017).  Fed. R. App. P. 28(j) Supplemental Authority (June 7, 2017).  Mr. Pickel also argues this forfeiture judgment violates the Eighth Amendment because it is grossly disproportionate to his crime and deprives him of any future ability to earn a livelihood.

"We review the district court's forfeiture order as we would any other sentencing determination—that is, we review its legal conclusions de novo and its factual findings for clear error."  *United States v. Bader*, 678 F.3d 858, 893 (10th Cir. 2012).  Section 853(a) requires, in relevant part, that "[a]ny person convicted of a violation of this subchapter or subchapter II of this chapter punishable by imprisonment for more than one year shall forfeit . . . any property constituting, or derived from, any proceeds the person *obtained*, directly or indirectly, as the result of such violation."  21 U.S.C. § 853(a) (emphasis added).

The district court impermissibly imposed joint and several liability on Mr. Pickel for property derived by his co-conspirators.  In *Honeycutt*, the Supreme Court resolved a circuit split regarding this issue.  It held that "[s]ection 853(a)'s limitation of forfeiture to tainted property acquired or used by the defendant, together with the plain text of § 853(a)(1), foreclose joint and several liability for co-conspirators."  *Honeycutt,* slip op. at 7.[25]  Rather, "[f]orfeiture pursuant to § 853(a)(1) is limited to property the defendant

---

[25] The Court focused on the statute's use of the word "obtain."  It explained that "[n]either the dictionary definition nor the common usage of the word 'obtain' supports the conclusion that an individual 'obtains' property that was acquired by someone else.  Yet joint and several liability would mean just that . . . ."  *Honeycutt v. United States*, No. 16-142, slip op. at 6 (June 5, 2017).  The words "directly or

Continued . . .

himself actually acquired as the result of the crime." *Id.* at 9. In other words, when a defendant did not "obtain" tainted property as a result of the crime, § 853(a) does not authorize forfeiture from that defendant. *Id.*

Because the district court did not address the amount of tainted proceeds "obtained" by Mr. Pickel, as required by § 853(a), we reverse the forfeiture order under *Honeycutt* and remand for resentencing regarding his forfeiture liability. Accordingly, we need not reach Mr. Pickel's Eighth Amendment argument. *See, e.g.*, *Dep't of Commerce v. U.S. House of Reps.*, 525 U.S. 316, 343 (1999) (finding "it unnecessary to reach the constitutional question presented" when the action was otherwise prohibited by statute).

## III. **CONCLUSION**

For the foregoing reasons, we affirm Mr. Pickel's convictions and his term of supervised release but reverse the forfeiture judgment and remand for resentencing regarding Mr. Pickel's forfeiture liability.

---

indirectly" are adverbs that only modify the verb "obtain." *Id.* These adverbs "refer to how a defendant obtains the property; they do not negate the requirement that he obtain it at all." *Id*.