**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 8, 2012**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

No. 10-2252

LINDA DIAZ,

Defendant-Appellant.

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D.C. NO. 1:09-CR-01578-LH-1)**

Samuel L. Winder, Albuquerque, New Mexico, for Appellant.

Jack E. Burkhead, Assistant United States Attorney (Kenneth J. Gonzales, United States Attorney, and Jennifer M. Rozzoni, Assistant United States Attorney, with him on the brief) Office the United States Attorney, Albuquerque, New Mexico, for Appellee.

Before **BRISCOE**, Chief Judge, **TYMKOVICH**, Circuit Judges, and **FREUDENTHAL**, Chief District Judge[*].

**TYMKOVICH**, Circuit Judge.

---

[*] The Honorable Nancy D. Freudenthal, Chief District Judge, United States District Court for the District of Wyoming, sitting by designation.

Linda Diaz was convicted of knowingly leaving the scene of a car accident where she hit and killed a pedestrian. The accident occurred on the Pojoajue Pueblo Indian reservation. She was charged with committing a crime in Indian Country under 18 U.S.C. § 1152. On appeal, among other issues, Diaz contends the federal court lacked jurisdiction over the crime because the government failed to prove that the victim was not an Indian, a jurisdictional requirement under § 1152.

We conclude the government met its burden of proof. The testimony of the victim's father provided enough evidence for a jury to conclude the victim was not an Indian for purposes of the statute. We also conclude the district court did not err in its rulings on various other evidentiary and trial issues.

Having jurisdiction pursuant to 18 U.S.C. § 1291, we AFFIRM.

## I. Background

Diaz was a member of the Pueblo of Pojoaque and its Lieutenant Governor. Around 4:00 a.m. on April 4, 2009, her car hit Philip Espinoza, who was walking on the shoulder of Highway 285, a highway that travels through the boundaries of the Pueblo. She left the scene of the accident without stopping, contacting the police, or offering assistance. Espinoza's body was found later that day.

An investigation disclosed that Diaz was the driver. She had been drinking the night of the accident at the nearby Tropicana Nightclub with family and friends. She later went to a friend's house where she may have consumed

additional alcohol. A few minutes after she left her friend's house, she called her sister from her cell phone, upset and crying. She told her sister she thought she had hit "something." Diaz's sister and adult daughter came over to comfort Diaz, and on their way they searched the highway but did not find anything.

The next morning Diaz told her son that she might have hit "an animal or maybe a person." Later, she called a lieutenant with the Pojoaque Police Department and told him that she had done something "very bad" and did not want to talk about it over the phone. When the lieutenant arrived at Diaz's home, he saw and secured her car, which had a dented fender, a broken windshield and passenger side mirror.

Diaz was subsequently indicted for knowingly leaving the scene of an accident resulting in great bodily harm, and after a trial the jury convicted her. The only disputed factual questions were whether Espinoza was a non-Indian for jurisdictional purposes and whether Diaz knew that she had hit a person rather than an animal or inanimate object.

The district court sentenced her to twelve months and one day of prison, followed by a year of supervised release. Diaz filed a motion for a new trial and motion for judgment of acquittal, both of which were denied. She then appealed.

## II. Discussion

Diaz raises five issues on appeal regarding our jurisdiction and various trial rulings. *First*, the district court lacked jurisdiction because the government failed

to prove beyond a reasonable doubt that the victim was non-Indian, as required by statute. *Second*, the court erred in instructing the jury. *Third*, the court abused its discretion when it allowed the jury to hear testimony about Diaz's alcohol consumption on the night of the offense, but disallowed evidence of the victim's drinking. *Fourth*, the court erred in commenting on testimony about road conditions. *Finally*, she is entitled to a new trial because of the prosecution's failure to disclose potential impeachment information about a prosecution witness.

We address each of these contentions in turn.

## A. Status of the Victim

Diaz first claims that the government produced insufficient evidence for a reasonable jury to conclude the victim was not an Indian, thus negating federal court jurisdiction over the charged crime.

"We review the record for sufficiency of the evidence *de novo*" to determine whether "a reasonable jury could find the defendant guilty beyond a reasonable doubt, given the direct and circumstantial evidence, along with reasonable inferences therefrom, taken in a light most favorable to the government." *United States v. Wilson*, 107 F.3d 774, 778 (10th Cir. 1997).

Diaz was charged with violating N.M. Stat. Ann. § 66-7-201, which makes it a crime to leave the scene of an accident resulting in great bodily harm or death. Under the General Crimes Act, 18 U.S.C. § 1152, if the accident occurs in

Indian Country and the victim or perpetrator is non-Indian, a crime can be charged and tried in federal court. 18 U.S.C. § 1152; *United States v. Antelope*, 430 U.S. 641, 643 n.2 (1977). Diaz does not contest that she is an Indian and a member of the Pojoaque Pueblo so, under this statutory scheme, for federal court jurisdiction the government must prove that the victim was not an Indian. *Id*.

The term "Indian" is "not defined in [18 U.S.C. § 1152] or in related statutes addressing criminal jurisdiction in Indian country," so we have adopted a two-part evidentiary test to determine whether a person is an Indian for the purposes of federal law. *United States v. Prentiss*, 273 F.3d 1277, 1279 (10th Cir. 2001). To find that a person is an Indian the court must first make factual findings that the person has "some Indian blood" and, second, that the person is "recognized as an Indian by a tribe or by the federal government." *Id.* at 1280 (citations omitted). *United States v. Keys*, 103 F.3d 758, 761 (9th Cir. 1996) (same test); *United States v. Torres*, 733 F.2d 449 (7th Cir. 1984) (same). A person satisfies the definition only if both parts are met; conversely the government can prove that a person is not Indian by showing that he fails either prong. This test, moreover, applies to determine the status of both a perpetrator or a victim of a crime in Indian Country.

Our cases applying this test have approved a totality-of-the evidence approach to determining Indian status, although certain types of evidence, by themselves, may not be sufficient. For example, a jury may not determine the

-5-

lack of Indian heritage solely "on the basis of their names, appearance, speech, and testimony that they did not grow up on the [particular] Pueblo." *United States v. Romero*, 136 F.3d 1268, 1274 (10th Cir. 1998).  And a jury may not find Indian heritage even if a person is a member of a particular tribe or pueblo; a showing of some "Indian blood" must also be shown.  *Prentiss*, 273 F.3d at 1283.  Evidence a person has an Indian tribal certificate that includes the degree of Indian blood, or membership in a tribe that will not accept members without a certain degree of consanguinity, however, has been held to satisfy the *Prentiss* test.  *United States v. Torres*, 733 F.2d at 456 (Tribal enrollment certificates that specified the degree of consanguinity combined with cancelled tribal dividend payment checks were "ample evidence to support the jury's finding that appellants . . . were Indians."); *United States v. Lossiah*, 537 F.2d 1250, 1251 (4th Cir. 1976) (government introduced "certificate of the Tribal Enrollment Officer of the Eastern band of Cherokee Indians that defendant is on Revised Roll No. 3902, was born May 8, 1943, and possesses three-fourths degree of Eastern Cherokee blood. That was adequate proof that defendant was a Cherokee Indian.").

Here, the government presented sufficient evidence of the victim's non-Indian status.  First, the victim's father, a teacher, testified that during college he had researched his family genealogy and that of his wife, the victim's mother, going back several hundred years.  That research disclosed his and his wife's family heritage as "Hispanic Jews" or "Sephardic Jews" and that neither he nor

his wife had any Native American or Indian background.  The victim's father also testified that his son was never enrolled in any tribe or pueblo and had not associated himself with any tribe or pueblo other than his job at a casino.  Diaz presented no rebuttal evidence, and the government did not offer any blood or DNA tests.

We conclude this testimony was sufficient to establish the victim's lack of Indian status.  While additional evidence from DNA testing might have been helpful, its absence does not undercut the testimony of the victim's father going back generations.  Nor does the government have a duty—as Diaz contends—to bring forth tribal officials to *disprove* the victim was a member of their tribes.  This is hardly realistic given the many tribes in New Mexico, and we are satisfied the father's testimony shows he was not a member of a tribe.  In any event, tribal membership in some tribes is possible for individuals who are not Indians.  *Keys*, 103 F.3d at 761.  Even if Espinoza were a member of a tribe or pueblo, this would not make him an Indian for the purposes of federal jurisdiction unless he had Indian ancestors.  *Prentiss*, 273 F.3d at 1283.

In sum, a reasonable jury could conclude from this evidence that the victim was not an Indian for purposes of federal law and that the district court therefore had jurisdiction over the charged crime.

### *B. Jury Instructions*

Second, Diaz contends the district court erred in instructing the jury on the knowledge requirement of the statute.

We "review de novo the jury instructions as a whole and view them in the context of the entire trial to determine if they accurately state the governing law and provide the jury with an accurate understanding of the relevant legal standards and factual issues in the case." *United States v. Bedford*, 536 F.3d 1148, 1152 (10th Cir. 2008) (quotation omitted). We "review the district court's decision to give or to refuse a particular jury instruction for abuse of discretion." *Id*.

Before examining Diaz's proposed instruction, a brief review of the relevant New Mexico statute is necessary. Leaving the scene of an accident requires, at a minimum, proof of the failure to stop or assist where an accident harms a person, and, if done knowingly, is a more serious crime. Section A outlines the general duty—to stop and remain at the scene—while Section B and Section C provide two levels of culpability depending on the driver's knowledge:

> A. The driver of any vehicle involved in an accident resulting in injury to or death of any person shall immediately stop the vehicle at the scene of the accident or as close thereto as possible, but shall then immediately return to and in every event shall remain at the scene of the accident until he has fulfilled the requirements of Section 66-7-203 NMSA 1978. Every such stop shall be made without obstructing traffic more than is necessary.

B. Any person failing to stop or to comply with the requirements of Section 66-7-203 NMSA 1978 where the accident results in great bodily harm or death is guilty of a fourth degree felony and shall be sentenced pursuant to the provisions of Section 31-18-15 NMSA 1978.

C. Any person who knowingly fails to stop or to comply with the requirements of Section 66-7-203 NMSA 1978 where the accident results in great bodily harm or death is guilty of a third degree felony and shall be sentenced pursuant to the provisions of Section 31-18-15 NMSA 1978.

N.M. Stat. Ann. § 66-7-201.

In the jury instruction, the district court instructed the jury that Section B was a lesser included offense to Section C. When instructing the jury, the court defined the Section C offense as "knowingly leaving the scene of an accident resulting in great bodily harm or death." And, "[t]o find the defendant guilty of this crime you must be convinced that the government has proved each of the following beyond a reasonable doubt . . . that the defendant knew that the accident resulted in great bodily harm or death of a person." App. V. I at 88.

The court also instructed the jury as to Section B:

If you unanimously find the defendant not guilty of the offense charged [Section C], or if, after all reasonable efforts, you are unable to agree on a verdict as to that offense, then you must determine whether the defendant is guilty or not guilty of the crime of leaving the scene of an accident resulting in great bodily harm or death.

The difference between these two offenses is that, to convict the defendant of leaving the scene of an accident resulting in great bodily harm or death, the government does not have to prove that the defendant knew that the accident involved a person or resulted in great bodily harm or death of a person.

App. V. I at 89.  This offense, as a lesser included offense, requires an element that "the defendant knew at the time of the accident that the accident occurred" but not the element of actual knowledge of harm or injury.  App. V. I at 89.

Diaz claims the district court erred in (1) rejecting her requested instruction defining "accident" as "an event that involves a person who is injured or killed," and (2) in instructing the jury on the lesser included offense of Section B without requiring that the defendant knew a person had been hit.  App. V. I at 66.  She argues the failure to define accident makes the statute a "strict liability crime," because the jury could find her guilty even if she did not know that she had injured a person.  She also contends the jury should not have been instructed on a Section B offense since there was no New Mexico precedent permitting a lesser included offense.

We disagree.  First, the district court in fact rejected the government's position that Section B was a strict liability offense.  Instead, the court instructed the jury that the Section requires a driver to know an accident occurred.  And, although New Mexico courts have yet to address the knowledge required for a violation of Section B of this statute, they have upheld convictions in circumstances similar to those here.  For example, in *State v. Cumpton*, 1 P.3d 429 (N.M. Ct. App. 2000), the court upheld a conviction where the defendant challenged the knowledge requirement for Section B.

In another case, the New Mexico Court of Appeals rejected a challenge to Section B because it does not contain a mens rea requirement. *New Mexico v. Munoz*, No. 28,327, 2009 WL 6667451 (N.M. App. Nov. 12, 2009). In acknowledging Section B as a lesser included offense, the court found "[t]here is no confusion as to what Defendant should have done once he had hit something: he should have returned to the scene of the accident to ensure that there was no person there in need of aid." *Id.* at *2.

In any event, in this case the district court correctly instructed the jury under Section C that it must find that Diaz *knowingly* left the scene of an accident resulting in great bodily harm or death of a person. To convict, the jury was required to find actual knowledge. Thus, Diaz's arguments about the construction of the statute are ultimately misplaced. Since the jury found the requisite knowledge element by convicting her under Section C, any mistake of law as to Section B's mens rea requirements had no affect on her conviction.

In sum, the district court did not abuse its discretion in instructing the jury.

### C. Pre-Trial Evidentiary Rulings

Prior to trial, the district court considered two motions in limine. In the first motion, Diaz sought to exclude testimony about her alcohol consumption in the hours before the accident. In the other motion, the government sought to exclude evidence that the victim had been drinking prior to walking on the roadside where he was hit. The district court allowed the evidence about Diaz's

-11-

drinking under Federal Rule of Evidence 404(b), concluding it tended to show

why she might have left the scene of the accident rather than stop and render aid.

The court denied evidence of the victim's drinking on relevancy grounds. We see

no error by the district court.

> Rule 404(b) requires a familiar four part test:
>
> (1) evidence of other crimes, wrongs, or acts must be introduced for
> a proper purpose; (2) the evidence must be relevant; (3) the court
> must make a Rule 403 determination whether the probative value of
> the similar acts is substantially outweighed by its potential for unfair
> prejudice; and (4) the court, upon request, must instruct the jury that
> the evidence of similar acts is to be considered only for the limited
> purpose for which it was admitted.

*United States v. Morris*, 287 F.3d 985, 990 (10th Cir. 2002). Evidence is proper

if it tends to prove, among other things, motive, knowledge, or intent. Fed. R.

Evid. 404(b)(2). "[E]xclusion of evidence under Rule 403 that is otherwise

admissible under the other rules is an extraordinary remedy and should be used

sparingly." *United States v. Tan*, 254 F.3d 1204, 1211 (10th Cir. 2001) (citation

omitted). "Admission of evidence under Federal Rule of Evidence 404(b) is

reviewed under an abuse of discretion standard." *United States v. Morris*, 287

F.3d 985, 989–90 (10th Cir. 2002).

Diaz first contends the district court erred in allowing evidence of her

drinking the night of the accident. We see no abuse of discretion in the district

court's evaluation of the requirements of Rule 404(b). First, the district court

found the evidence of her alcohol consumption was for a proper purpose and

relevant. The evidence tended to show motive and knowledge, because "evidence of Defendant's drinking alcohol in the hours before the incident establishes an evidentiary hypothesis that provides at least one reason as to why Defendant might have left the scene." Mem. Op. & Order, Supp. App. v. I at 42. Thus, the evidence tended to be both relevant and probative. As to prejudice, the court found that the "evidence of Defendant's alcohol consumption is no more sensational or disturbing than the charged crime of leaving the scene of a fatal accident." *Id*. at 43–44.

As to evidence of the victim's intoxication, Diaz claims it was necessary to give the jury the proper context for the accident by showing why the victim would be walking on the highway at such a late hour. We agree with the court's conclusion as to relevance. Under the statute, the driver of a vehicle has a duty to stop and assist; the mental state of the victim or the reasons he was on the roadway do not relieve the driver's duty. Nor was his drinking intertwined with the elements of the crime such that its admission was necessary for the jury to determine guilt or innocense.

The district court did not abuse its discretion in excluding the evidence.

### D. *Comments on the Evidence*

Diaz next argues that the district court made inappropriate and prejudicial comments about the evidence in front of the jury. The comments stemmed from her attempts to elicit testimony showing where the victim was walking on the

roadway and what the victim was wearing at the time of the accident. The court, in restricting additional testimony on the topics, commented that it could not "see the relevance of" this testimony and that it was "far afield from the issues in the case." Supp. App. V. IV at 549. And when her attorney cross-examined a government witness about the design and safety of the road the judge interrupted to say "I'm having trouble understanding the relevance of whether or not that was a designated traffic lane or not." When the lawyer continued with the cross examination, the judge repeated "I still can't see the relevance of that." *Id*. Diaz claims the testimony helped explain that she did not realize she had struck a person and that the judge's remarks influenced the jury against her theory of the case.

The parties dispute the proper standard of review. But whether the standard is abuse of discretion or plain error review, we see no error. The district court has discretion "to comment reasonably upon the evidence, being careful not to become an advocate for any of the parties." *United States v. Baker*, 638 F.2d 198, 203 (10th Cir. 1980). While the court's comments may have expressed some skepticism of this line of defense, Diaz adequately developed her theory at trial and argued it in closing. The court's comments in light of the entire record did not deprive Diaz of a fair trial or abuse the court's discretion.

The comments were also harmless. The government offered contrary evidence showing that Diaz called her sister that night shortly after the accident,

crying, and told her that she "hit something," Supp. App. V. IV at 480; that she told her son the following morning that she had "hit an animal or maybe a person," Supp. App. V. V at 679; and that she called a member of the tribal police and told him that he needed to come over because she had "done something very bad," Supp. App. V. III at 310. All of this evidence points to Diaz's knowledge that she struck a person and knew it, even if it was unusual for a pedestrian to be on the highway at that hour.

Given this extensive record, the district court's comments did not prejudice Diaz's right to a fair trial.

### E. Undisclosed Impeachment Evidence

Finally, Diaz contends the government failed to disclose impeachment evidence about a witness. The witness, a Santa Fe Sheriff's officer, had been part of a SWAT team in the mid-1990's whose encounter with Diaz's cousin led to the death of a police officer. The cousin was later acquitted on a self-defense theory. He sued the SWAT team, and the lawsuit settled. Diaz claims the witness, who testified as the government's accident reconstruction expert, may have known that she was the cousin of the shooter and harbored bias against her as a result of the incident. Because the government did not disclose the SWAT team incident prior to trial, she claims it withheld impeachment evidence that undermined her defense in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972).

In applying *Brady*, we require "the prosecution to disclose all evidence that favors the defendant and is material either to guilt or to punishment." *United States v. Ford*, 550 F.3d 975, 981 (10th Cir. 2008). To establish a *Brady* violation the "defendant must demonstrate that (1) the prosecution suppressed evidence, (2) the evidence was favorable to the defendant, and (3) the evidence was material." *Id.* For the evidence to be material, there must be a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. *Smith v. Cain,* 132 S. Ct. 627, 630 (2012). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). And finally, although, "[i]mpeachment evidence is considered exculpatory for *Brady* purposes," *United States v. Torres*, 569 F.3d 1277, 1282 (10th Cir. 2009), "evidence impeaching [a witness] may not be material if the State's other evidence is strong enough to sustain confidence in the verdict." *Smith,* 132 S. Ct. at 630.

In denying a motion for a new trial based on the undisclosed evidence, the district court cited several grounds: (1) the evidence was of limited value since it did not go to the witness's truthfulness, (2) the possibility that the witness knew about the family relationship of Diaz and her cousin was entirely speculative, and

(3) the witness's testimony was not material because it did not bear on the key question of her knowledge about the accident.

Diaz claims the undisclosed evidence was both favorable and material because the officer's trial testimony was important in establishing whether the victim was walking in an unsafe location and whether the car damage was consistent with striking a human. Even assuming favorability (and that is doubtful here), Diaz cannot show materiality—that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985).

The district court correctly noted that the officer's testimony was of limited probative value. Diaz did not contest that her car was involved in an accident, and the officer did not testify about whether Diaz knew she had hit someone. Moreover, substantial evidence established that Diaz knew she hit a person, including her statements to her sister, niece, and son; her nervous demeanor and state of mind after the accident; and her failure to explain her actions immediately after the accident. Given this evidence, the district court did not err in concluding the undisclosed evidence was not material under *Brady*.

As to the officer's testimony about the victim's unsafe walking, the district court found it of no relevance, since a pedestrian's negligence does not obviate the obligation to stop and render aid. In any event, as the government points out,

the officer provided some useful testimony to the defense. He testified that at the 45 miles per hour speed limit, the victim's body would have been visible against her windshield for "less than 1/10th of a second . . . less than the blink of an eye." Supp. App. V. IV at 542–43. This testimony tended to bolster Diaz's defense that she was not confident she had hit a person.

In sum, Diaz is not entitled to a new trial on her *Brady* claim.

## III. Conclusion

For the reasons set forth above, we AFFIRM Diaz's conviction.