**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 21, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

ADAM JOSEPH KING,

    Defendant - Appellant.

No. 25-5014

_____

**Appeal from the United States District Court**
**for the Northern District of Oklahoma**
**(D.C. No. 4:24-CR-00081-JDR-1)**
_____

Jared T. Guemmer, Assistant Federal Public Defender (Julia L. O'Connell, Federal Public Defender, with him on the briefs), Office of the Federal Public Defender for the Northern District of Oklahoma, Tulsa, Oklahoma, appearing for Appellant.

Elliot Anderson, Assistant United States Attorney (Clinton J. Johnson, United States Attorney, with him on the brief), Office of the United States Attorney for the Northern District of Oklahoma, Tulsa, Oklahoma, appearing for Appellee.
_____

Before **MATHESON**, **EBEL**, and **CARSON**, Circuit Judges.
_____

**MATHESON**, Circuit Judge.
_____

A federal grand jury indicted Adam Joseph King for Aggravated Sexual Abuse

of and Abusive Sexual Contact with a Minor Under 12 in Indian Country. The

indictment included two sets of alternate charges.  Counts One and Two charged Mr. King as a non-Indian with an Indian victim under 18 U.S.C. § 1152.  Counts Three and Four charged him as an Indian of the same crimes under 18 U.S.C. § 1153.

Mr. King moved to dismiss the indictment for multiplicity or to require the prosecution to elect which charges it wished to pursue at trial.  The district court denied the motion.  The case proceeded to trial, and the court instructed the jury that it could convict Mr. King as a non-Indian or as an Indian, but not both.  The jury found Mr. King guilty on Counts One and Two.

On appeal, Mr. King argues (A) the evidence was insufficient to prove (i) the victim was an Indian or (ii) that he was a non-Indian and (B) the district court erred on the multiplicity issue.  Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.  BACKGROUND

### A.  *Legal Background*

Under the General Crimes Act, "the general laws of the United States as to the punishment of offenses committed in any place within the sole and exclusive jurisdiction of the United States . . . shall extend to the Indian country."  18 U.S.C. § 1152; *see Oklahoma v. Castro-Huerta*, 597 U.S. 629, 639 (2022).  This statute does not extend, however, to "offenses committed by one Indian against . . . another Indian," 18 U.S.C. § 1152, nor to offenses committed by a non-Indian against another non-Indian, *United States v. McBratney*, 104 U.S. 621, 623-24 (1881).  Section 1152 therefore applies only if the defendant was a non-Indian and the victim was an Indian, or vice versa.  *United States v. Walker*, 85 F.4th 973, 979 (10th Cir. 2023).

Under the Major Crimes Act, "[a]ny Indian who commits against the person or property of another Indian or other person" certain enumerated offenses "shall be subject to the same law and penalties as all other persons committing [the same offense], within the exclusive jurisdiction of the United States." 18 U.S.C. § 1153(a); *see Castro-Huerta*, 597 U.S. at 641.

## B. *Factual History*

Between November 2017 and August 2021, Mr. King sexually abused and assaulted M.V.,[1] his girlfriend's minor daughter.[2] The abuse ended after M.V. reported it to a school counselor, who then alerted the relevant government authorities.

## C. *Procedural History*

In May 2023, the State of Oklahoma charged Mr. King in state court as a non-Indian under Oklahoma law for his abuse of M.V.[3] In June 2023, the

---

[1] The parties agree to refer to the victim as "M.V." to preserve anonymity. Aplt. Br. at 4 n.2.

[2] The abuse occurred in "Indian country," *see* 18 U.S.C. § 1151, in Catoosa, Oklahoma and Pryor, Oklahoma, both located on the Cherokee Reservation, as well as Tulsa, Oklahoma, located on the Muscogee (Creek) Reservation.

[3] State criminal jurisdiction over a non-Indian is proper under either *McBratney*, 104 U.S. at 624, or *Castro-Huerta*, 597 U.S. at 632-33, depending on the Indian status of the victim.

Cherokee Nation charged Mr. King in tribal court as an Indian for the same abuse.[4]

Mr. King moved to dismiss the Oklahoma prosecution, arguing the state court lacked

jurisdiction because he was an Indian. He also moved to dismiss the

Cherokee Nation prosecution, arguing he was not an Indian.

In March 2024, a federal grand jury charged Mr. King with

- Count One – Aggravated Sexual Abuse under § 1152
- Count Two – Abusive Sexual Contact under § 1152
- Count Three – Aggravated Sexual Abuse under § 1153
- Count Four – Abusive Sexual Contact under § 1153

All counts alleged the crimes were committed against a minor in Indian country in

violation of 18 U.S.C. §§ 1151, and 2241(c) or 2244(a)(5). Counts One and Two

alleged the same conduct as Counts Three and Four. But Counts One and Two

required proof that Mr. King was a non-Indian and M.V. was an Indian, and

Counts Three and Four required proof that he was an Indian.

After the district court denied Mr. King's motion to dismiss the indictment for

multiplicity or to require the Government to elect charges, the case proceeded to trial.

The district court denied Mr. King's motions for judgment of acquittal under

Federal Rule of Criminal Procedure 29.

---

[4] Tribal criminal jurisdiction over an Indian is also proper. *See United States v. Wheeler*, 435 U.S. 313, 323-26 (1978) (tribes can prosecute own members); *United States v. Lara*, 541 U.S. 193, 196 (2004) (tribes can prosecute nonmember Indians).

The jury found Mr. King guilty of Counts One and Two. The district court sentenced him to life in prison followed by a life term of supervised release. He timely appealed.

## II. DISCUSSION

On appeal, Mr. King argues (A) the evidence was insufficient to prove (i) that M.V. was an Indian or (ii) he was a non-Indian and (B) the district court erred by allowing the Government to present multiplicitous charges to the jury.

### A. *Sufficiency of the Evidence*

Because the jury convicted Mr. King as a non-Indian under § 1152, it must have found beyond a reasonable doubt that M.V. was an Indian and that Mr. King was a non-Indian when the offense occurred.[5]

### 1. Legal Background

#### a. *Standard of Review*

We review a sufficiency of the evidence challenge de novo, considering the evidence in the light most favorable to the Government. *United States v. Pickel*, 863 F.3d 1240, 1251 (10th Cir. 2017). Because "we owe considerable deference to the jury's verdict" *United States v. King*, 632 F.3d 646, 650 (10th Cir. 2011) (quotations omitted), "[t]his review is highly deferential," *United States v. Burtrum*, 21 F.4th 680,

---

[5] This court recently held in a § 1153 case that the government must prove "beyond a reasonable doubt that the defendant was recognized as an Indian *at the time of the charged offense*." *United States v. Hatley*, 153 F.4th 1112, 1123 (10th Cir. 2025) (emphasis added). We assume without deciding that this holding applies to proof of Indian or non-Indian status in a § 1152 prosecution.

685 (10th Cir. 2021) (quotations omitted), which "provides us with very little leeway." *United States v. Sells*, 477 F.3d 1226, 1235 (10th Cir. 2007) (quotations omitted).

"[W]e consider all of the evidence, direct and circumstantial, along with reasonable inferences," *Pickel*, 863 F.3d at 1251 (quotations omitted), but we do not weigh evidence or witnesses' credibility, *United States v. Earls*, 129 F.4th 850, 859 (10th Cir. 2025). We must respect that juries have "broad discretion" to "draw reasonable inferences from basic facts to ultimate facts," *Coleman v. Johnson*, 566 U.S. 650, 655 (2012) (per curiam) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

We thus determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Musacchio v. United States*, 577 U.S. 237, 243 (2016) (quotations omitted). For a rational jury to do so, the evidence "must be substantial, but it need not conclusively exclude every other reasonable hypothesis and it need not negate all possibilities except guilt." *United States v. MacKay*, 715 F.3d 807, 812 (10th Cir. 2013) (quotations omitted).

  b.  *Indian status*

The Indian and non-Indian statuses of the defendant and victim are essential elements of a § 1152 offense. *United States v. Prentiss* ("*Prentiss I*"), 256 F.3d 971, 980 (10th Cir. 2001) (en banc) (per curiam). "To find that a person is an Indian the [finder of fact] must first make factual findings that the person has 'some Indian blood' and, second, that the person is 'recognized as an Indian by a tribe or by the federal government.'" *United States v. Diaz*, 679 F.3d 1183, 1187 (10th Cir. 2012)

6

(quoting *United States v. Prentiss* ("*Prentiss II*"), 273 F.3d 1277, 1280 (10th Cir. 2001)).  "A person satisfies the definition only if both parts are met; conversely the government can prove that a person is not Indian by showing that he fails either prong."  *Id.*

A person has "some Indian blood" if he has "Indian ancestors."  *Id.* at 1187-88; *United States v. Reza-Ramos*, 816 F.3d 1110, 1121 (9th Cir. 2016) (explaining that the "some quantum of Indian blood" test "requires ancestry living in America before the Europeans arrived" (quotations omitted)).  "[E]vidence of a parent, grandparent, or great-grandparent who is clearly identified as an Indian is generally sufficient to satisfy this prong."  *United States v. Bruce*, 394 F.3d 1215, 1223 (9th Cir. 2005); *see also United States v. Nowlin*, 555 F. App'x 820, 823 (10th Cir. 2014) (unpublished).[6]

"To determine whether a tribe or the federal government recognizes someone as an Indian, courts have identified several nonexclusive factors, including (1) enrollment in a tribe, (2) provision of government assistance reserved only for Indians, (3) enjoying the benefits of tribal affiliation, and (4) social recognition as an Indian through living on a reservation and participating in Indian social life."  *United States v. Hebert*, 159 F.4th 777, 780 (10th Cir. 2025); *United States v. Antelope*, 430

---

[6] We cite unpublished opinions for their persuasive value under Fed. R. App. P. 32.1; 10th Cir. R. 32.1.

U.S. 641, 646 n.7 (1977) (noting that "enrollment in an official tribe has not been held to be an absolute requirement").

2. **Analysis**

To determine whether the evidence was sufficient to show that M.V. was an Indian and Mr. King was a non-Indian when the offenses occurred, we consider "all of the evidence, direct and circumstantial." *Pickel*, 863 F.3d at 1251 (quotations omitted). Although a single item of circumstantial evidence may not be conclusive, we consider "the collective inferences that can be drawn from the evidence as a whole." *See United States v. Smith*, 606 F.3d 1270, 1280 (10th Cir. 2010).[7]

a. *M.V.'s Indian status*

The parties agree that M.V. has some Indian blood. *See* Aplt. Br. at 39; Aplee. Br. at 17. The jury must also have found that the federal government or a federally-recognized tribe recognized M.V. as an Indian.

i. Trial evidence

1) M.V.

M.V. testified that she is an Indian, that her mother and maternal grandmother are enrolled Cherokee Nation members, and that her biological father and his family are enrolled Seminole Nation members. She also testified that she is attending a school that admits only Indians as students.

---

[7] As Professor McCormick famously wrote, "A brick is not a wall." 1 McCormick on Evidence § 185.2 (9th ed. 2025).

2) Derrick Vann and Government Exhibit 38

Derrick Vann is the Tribal Registrar and Executive Director of the Tribal Recognition Department for the Cherokee Nation. He testified that M.V. was an enrolled member of the Cherokee Nation as of December 7, 2022, and confirmed that tribal registration documents contained in Government's Exhibit 38 say her blood quantum is 1/1024. He also testified that a previous attempt to enroll M.V. as a Cherokee was rejected because of a documentation issue. Mr. Vann explained that the benefits of enrollment include health care, car tags, housing, and food assistance.

Defense counsel asked Mr. Vann if his "records reflect that MV was not recognized as an Indian before December of 2022," to which Mr. Vann responded "[c]orrect." ROA, Vol. IIIA at 403.

3) Kimberly Trammel

Kimberly Trammel, M.V.'s maternal grandmother, testified as follows. She is an enrolled member of the Cherokee Nation, and her blood quantum is 1/256. She was present when M.V. was born at the Indian hospital in Claremore, Oklahoma. M.V. received health care services at tribal facilities for her first 18 months. M.V. was eligible to be enrolled in the Cherokee Nation when she was born, but for reasons unknown to her, M.V.'s mother did not enroll her.

After M.V.'s abuse allegations against Mr. King came to light in 2021, she and her husband obtained guardianship over M.V. and her brother in Cherokee Nation court because "[she and her husband] are Native and [M.V.] is Native." *Id.* at 418-19.

9

When M.V. entered her care, she took M.V. for treatment at an Indian hospital. She was able to arrange these services for M.V. because M.V.'s mother is an enrolled Cherokee Nation member and is listed on M.V.'s birth certificate as her natural mother.

### 4) Bill Trammel

Bill Trammel is married to Ms. Trammel and identifies himself as M.V.'s grandfather. He testified as follows. He has known M.V. since she was born. To his knowledge, she is an Indian. He and Ms. Trammel went to a Cherokee Nation court to be appointed M.V.'s and her brother's guardians because the children are "Indian." *Id.* at 428. During guardianship proceedings, tribal officials conducted a home inspection, background checks, and periodic visits. M.V. was born in an Indian hospital and received health benefits at an Indian hospital after he and Ms. Trammel took her into their care.

M.V. was enrolled as a Cherokee Nation member after the Trammels became her guardians. She received and was eligible for most of the health care discussed at trial before she was enrolled. In the next school year, she may attend a private school that permits only Indians to enroll.

### 5) Emily Anazagasty

Emily Anazagasty, M.V.'s biological mother, testified as follows. M.V.'s biological father is Cody Bearden, whom she believed was an enrolled member of a federally-recognized tribe. She was in a romantic relationship with Mr. King during the abuse of M.V. and at the time of the trial.

She is an enrolled member of the Cherokee Nation and primarily uses her membership for health care benefits. M.V. was born in an Indian hospital, and she took M.V. to an Indian hospital for her baby checkups. For the next several years, she and M.V. lived in New York and had no access to tribal health care.

When they returned to Oklahoma, she enrolled M.V. and her little brother with Cherokee Nation Health Services ("CNHS"). She considered the Cherokee Nation to be the primary source of M.V.'s medical care. To enroll her children with CNHS, she provided her Cherokee ID and the children's birth certificates to verify she is their natural mother. In 2017, she attempted to enroll M.V. in the Cherokee Nation, but the application was rejected because she had failed to provide her own original birth certificate.

### ii. Recognition

As noted above, it is undisputed that M.V. has Indian blood, so her Indian status at trial turned on the recognition element for Indian status.

Based on the foregoing evidence, a rational jury could find that (1) M.V. received health care from CNHS due to her mother's enrollment as a Cherokee, (2) the Cherokee Nation conducted M.V.'s guardianship proceedings, and (3) M.V. enrolled in the Cherokee Nation and holds herself out as an Indian. From these findings, a rational jury could find that M.V. was an Indian at the time of the abuse. *United States v. Ruiz*, 164 F.4th 1223, 1226 (10th Cir. 2026) ("Our cases . . . have approved a totality-of-the-evidence approach to determining Indian status, although

11

certain types of evidence, by themselves, may not be sufficient." (quoting *Diaz*, 679 F.3d at 1187)).

### 1)  Health care benefits

The evidence showed that M.V. was born at an Indian hospital.  Her mother, Ms. Anazagasty, took her there for the next 18 months for medical appointments.  Several years later, when Ms. Anazagasty and her children returned to Oklahoma after living in New York, she enrolled them with CNHS.  To do so, she provided her Cherokee ID and the children's birth certificates to verify she is their natural mother.  After the Trammels became M.V.'s guardian, she continued to receive health care at CNHS.[8]

The Government contends the medical services evidence was sufficient to show that M.V. was an Indian when the offenses occurred and that *United States v. Drewry*, 365 F.3d 957 (10th Cir. 2004),[9] controls.  Aplee. Br. at 18 ("*Drewry* is fatal to King's

---

[8] Congress enacted the Indian Self-Determination and Education Assistance Act ("ISDA") to help Indian tribes assume responsibility for aid programs that benefit their members, including health care.  Pub. L. 93-638, 88 Stat 2203 (1975) (codified as amended 25 U.S.C. § 5301 *et seq*).  "Under the ISDA, tribes may enter into self-determination contracts with federal agencies to take control of a variety of federally funded programs." *Menominee Indian Tribe of Wis. v. United States*, 577 U.S. 250, 252 (2016).  Here, the evidence did not specify whether M.V.'s tribal health care occurred at an Indian Health Services ("IHS") facility or a Cherokee Nation hospital operated under the ISDA.  Because receipt of CNHS benefits would indicate recognition through either the United States or the Cherokee Nation, the IHS or ISDA status of CNHS does not affect our analysis.

[9] *Drewry* was *vacated on other grounds*, 543 U.S. 1103 (2005), and *reinstated as originally published*, 133 F. App'x 543, 546 (10th Cir. 2005) (unpublished).

argument."). Mr. King disagrees, challenging *Drewry*'s analysis as incomplete and distinguishable. *See* Aplt. Reply Br. at 16-18.

In *Drewry*, the defendant "was convicted of five charges of physical and sexual abuse of four children in Indian country." 365 F.3d at 959. On appeal, he said "the government failed to present sufficient evidence proving the victims were Indians for purposes of 18 U.S.C. § 1152." *Id.* at 960. In describing the evidence, the court said that "[t]he children in this case were not officially enrolled as members in the Comanche tribe until after the date of at least two of the allegations in the indictment . . . . But enrollment in a tribe is not the only way an individual can show she is an Indian under 18 U.S.C. § 1152." *Id.* at 961.

The court then said the following evidence was sufficient to prove the victims were recognized as Indians:

> First, the children received medical care from Indian Medical Services and their receipt of such care was not predicated on a determination that they fell within one of the two exceptions allowing for the provision of care to non-Indians. Rather, evidence indicated their medical care was based on an assumption that they were Indians eligible for such treatment.
>
> [Second,] [l]ikewise, the children were permitted to attend a summer camp open only to Comanche children. Their enrollment in the camp was pursuant to the direction of the Comanche tribal chairman who indicated to camp officials that the children were in fact Comanche.
>
> [Third,] [t]he children also participated in the social life of the tribe through their attendance at pow-wows.
>
> [Fourth and] [f]inally, when Mr. Drewry's abuse of the children was reported, the children were taken into tribal rather than state custody. A caseworker from the Indian Child Welfare Office specifically testified that "my boss told us that [the children] were eligible Comanches and they were coming into our custody. If they weren't eligible, they would have gone to DHS custody . . . ."

13

*Id.* at 961.

Mr. King argues the *Drewry* panel failed to explain the statements about medical services. We agree that the opinion does not identify "the two exceptions," and even though the victims were not enrolled until after the defendant committed at least two of the charged offenses, it does not say when the children received medical services and assumed "they were Indians eligible for such treatment." *Id.*

Because the IHS statute authorizes health care for (1) tribal members, (2) members' minor children (biological or otherwise), and (3) members' spouses, 25 U.S.C. §§ 1603(13), 1680c, the "exceptions" *Drewry* referred to most likely were provisions (2) and (3). Despite the evidence that the *Drewry* victims were not enrolled members when at least two of the offenses occurred, the court assumed they were eligible for health care as Indians, which it in turn said was probative of tribal recognition.

Here, the evidence showed that M.V. received health care as a tribal member's minor child, not because she was a tribal member. As Mr. King argues, unlike the court in *Drewry*, we cannot assume M.V.'s treatment was based on her own Indian status rather than her mother's. Aplt. Reply Br. at 16-18. So *Drewry* is not as controlling as the Government urges. But it does not follow, as Mr. King argues, that receipt of health care is relevant to recognition of Indian status only when tribal members receive it. *Id.* at 17. M.V.'s receipt of health care as a child based on her mother's tribal membership is at least relevant to her Indian status and may be considered along with other relevant evidence in the sufficiency analysis. *See United States v. Labuff*, 658 F.3d

873, 878 (9th Cir. 2011) ("[W]e conclude that because LaBuff frequently received healthcare services on the basis of his status as a descendent of an enrolled member, he enjoyed the 'benefits' of his tribal affiliation . . . .").

Our unpublished decision in *Nowlin* bears this out. There, the defendant, like M.V., had some Indian blood but was not an enrolled member of, in this instance, the Eastern Shoshone tribe. 555 F. App'x at 823. In assessing whether he was recognized as an Indian, we identified his "access to free healthcare from the Indian Health Service" as relevant. *Id.*; *see also United States v. Keys*, 103 F.3d 758, 760-61 (9th Cir. 1996) (recognizing relevance of the victim's being "provided medical services at an Indian hospital"); *United States v. Stymiest*, 581 F.3d 759, 765 (8th Cir. 2009) (same). Mr. King argues that *Nowlin* is "unhelpful" because "the evidence of the defendant's Indian status bordered on overwhelming." Aplt. Br. at 47. Even so, the weight of Indian status evidence does not negate its relevance.

2) Tribal Involvement in Guardianship

The Cherokee Nation's role in M.V.'s guardianship also is relevant to whether she was an Indian when the abuse occurred. Mr. King argues that because "the guardianship proceedings occurred after the charged offenses, not before," they "cannot prove recognition at the time of the offense." Aplt. Br. at 31. But in *Drewry*, the child victims "were taken into tribal rather than state custody" after the

abuse was discovered. 365 F.3d at 961.[10] We said this evidence tended to show that the tribe recognized the children as Indians. *Id.*; *see also Keys*, 103 F.3d at 760-61 (considering as relevant to recognition that "[q]uestions concerning [minor's] care and custody were litigated in . . . Tribal Court").[11] So too, here, with M.V.

### 3) M.V.'s Testimony

M.V. testified that she is an Indian. Mr. Trammel confirmed she had enrolled in the Cherokee Nation since being placed with her grandparents. Although M.V. was not enrolled in the tribe at the time of the abuse, we said in *Nowlin* that "holding [one]self out as an Indian" is relevant to Indian recognition. 555 F. App'x at 824; *see also United States v. Laskey*, No. 22-5115, 2024 WL 3898299, at *1-2, *4 (10th Cir. Aug. 22, 2024) (unpublished) (finding testimony that the victim "is a member of the Cherokee tribe" was sufficient for the recognition prong of Indian status).

M.V.'s testimony that her mother and grandmother—both of whom raised M.V.—are Cherokee also lends support to Indian recognition.[12] *See Nowlin*, 555 F. App'x at 824 (considering evidence of Indian relatives relevant to social

---

[10] Here, the Trammels obtained an emergency guardianship over M.V. and her brother in Cherokee Nation within days of the abuse.

[11] Under the Indian Child Welfare Act ("ICWA"), "'Indian child' is defined broadly to include not only a child who is 'a member of an Indian tribe,' but also one who is 'eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe.'" *Haaland v. Brackeen*, 599 U.S. 255, 265 (2023) (quoting 25 U.S.C. § 1903(4)).

[12] She also said that her biological father and his family are Seminole tribe members.

recognition); *United States v. Maggi*, 598 F.3d 1073, 1082 (9th Cir. 2010) (stating that

"descendant status . . . reflects some degree of recognition"); *Keys*, 103 F.3d at 760-61

(recognizing as relevant to recognition that both parents were enrolled in the tribe

even though the minor victim was not); *Labuff*, 658 F.3d at 878 (stating receipt of

services "on the basis of . . . status as a descendent of an enrolled member" is evidence of

"'benefits' of . . . tribal affiliation").

* * * *

In sum, "consider[ing] all of the evidence, direct and circumstantial, along

with reasonable inferences," *Pickel*, 863 F.3d at 1251 (quotations omitted), and

"viewing the evidence in the light most favorable to the prosecution," we conclude

that a "rational trier of fact could have found" that M.V. was an Indian "beyond a

reasonable doubt." *Musacchio*, 577 U.S. at 243.

b. *Mr. King's non-Indian status*

Under § 1152, the Government needed to prove that Mr. King was a

non-Indian. As noted above, it could do so by proving that he lacked (1) Indian

blood or (2) federal or tribal recognition as an Indian. *See Diaz*, 679 F.3d at 1187.

Applying our sufficiency standard of review to the evidence, we conclude that the

Government presented enough evidence to show Mr. King was not an Indian based

on lack of Indian blood. We therefore do not address the recognition element of

Indian status.

17

i.  Trial evidence

1)  Krystal Dunckel

Krystal Dunckel, Mr. King's biological sister and older by six years, testified as follows.  She and Mr. King are Janice King and Timothy Carson's biological children and Clarence King's adopted children.  She is an enrolled member of the Delaware Tribe of Indians based on Clarence King's tribal affiliation, but she has no Indian blood as to that tribe.

Neither of her biological parents were enrolled members of a tribe, but someone told her that her mother's aunt and uncle are.  She could not identify their tribe or any blood quantum.  She does not know her great aunt's last name and had never spoken to either of them.  She and her siblings were "not raised as in the belief" they are Indians, and although they were told about Indian heritage, they "never did anything in the [nature] of powwows or anything like that."  ROA, Vol. IIIA at 573.

2)  Kellie Guess

Kellie Guess, also Mr. King's biological sister and four years older, testified that her biological parents are Timothy Carson and Janice King and that Clarence King adopted her.  She had applied for enrollment in the Delaware Tribe of Indians based on her adopted father's lineage but had not received a response in two years.  She had no documentation, proof, or paperwork suggesting any Indian heritage in her family, and had no information or proof that she had any Indian blood.

When asked if anyone in her biological family had Indian heritage, she responded, "Nothing that is—that I'm aware of, no." *Id.* at 578-79.

### 3) Emily Haney

Emily Haney is the enrollment director for the Delaware Tribe of Indians, a federally recognized tribe. She testified that Mr. King applied for membership in March 2023 and was enrolled in April 2023 based on his birth certificate listing Clarence King as his father. Although Ms. Haney approved Mr. King's application, she later learned that Clarence King is not his biological father. She explained that adoptive relationships do not confer a blood quantum or eligibility for enrollment on a child, that Mr. King had not shown a degree of Indian blood, and that he should not have been admitted to the tribal rolls. Had this information been known to the tribe when he applied, Mr. King's application would not have been granted.

### 4) Emily Anazagasty and Government Exhibit 46

Ms. Anazagasty testified that she was aware of Mr. King's enrollment in the Delaware Tribe of Indians in April 2023 and knew he planned to use it as a jurisdictional defense to prosecution. She was aware of Mr. King's motion to dismiss the state charges against him by claiming he was an Indian. Also, the jury saw in Government's Exhibit 46 text messages from Mr. King to Ms. Anazagasty in 2024 stating that while he "wasnt [sic] tribal" at the time of the abuse, M.V. would be considered tribal as an unenrolled but "eligible minor." Suppl. ROA, Vol. I at 64.

5) Special Agent Tiffany Harrison and Government Exhibits 41 and 42

FBI Special Agent Tiffany Harrison was involved in the investigation of Mr. King. She testified that the FBI reached out to various tribal entities and confirmed that no members of Mr. King's mother's lineage were registered with any of those tribes. She also said that she had not "receive[d] any information that any of those people had a degree of Indian blood." ROA, Vol. IIIA at 601.

During this testimony, the jury saw a copy of Mr. King's 2023 motion to dismiss the prosecution against him in Oklahoma state court, Government's Exhibit 41, which asserted that he was an enrolled member of the Delaware Tribe of Indians and cannot be prosecuted in state court. The jury also saw a copy of Mr. King's 2023 motion to dismiss the prosecution against him in Cherokee Nation court, Government's Exhibit 42, which asserted that he was not a member of any federally recognized tribe "until April 19, 2023" and that he "was not an enrolled member of any tribe during the time these crimes were alleged." Suppl. ROA, Vol. I at 47-51 (Exhibit 42).

## ii. Indian Blood

Based on the foregoing evidence, a rational jury could find beyond a reasonable doubt that Mr. King lacked Indian blood.

### 1) The Sisters' Testimony

A rational jury could infer from Mr. King's sisters that Mr. King lacks Indian blood. He argues that their testimony was comparable to that of Ms. Byers, the

20

defendant's stepdaughter in *Hebert*, where we found the evidence insufficient to prove non-Indian status.  Aplt. Reply Br. at 11-12.  We disagree.

This case is more like *Diaz*, where we found the evidence sufficient to show the § 1152 victim had no Indian blood, than it is to *Hebert*.  First, the prosecution in *Hebert* "laid a thin foundation of how well Ms. Byers knew Mr. Hebert," 159 F.4th at 787—they had lived together for only two days when the above occurred, *id.* at 781—whereas here the sibling relationship is closer to the father-son relationship in *Diaz*, 679 F.3d at 1187-88.[13]  Second, we said in *Hebert* that Ms. Byers's testifying that Mr. Hebert never mentioned "being an Indian" told "nothing about his ancestry," 159 F.4th at 787, and that the prosecution presented no other Indian blood evidence.  By contrast, like the father in *Diaz*, 679 F.3d at 1187-88, the sisters testified at length about family history.  Third, unlike Ms. Byers, the sisters were asked about their own family heritage, not someone else's.  So *Hebert* does not help Mr. King.  And unlike Ms. Byers's testimony, under our "highly deferential" standard of review, *Burtrum*, 21 F.4th at 685, the sisters' testimony supports a jury finding of no Indian blood.[14]

---

[13] Mr. King's relationship with Ms. Anazagasty also was closer than Mr. Hebert's with Ms. Byers.

[14] Mr. King suggests that "[a] family member testifying that their family lacks Indian blood must demonstrate real genealogical knowledge of that absence, otherwise DNA testing is needed to prove an absence of Indian blood."  Aplt. Reply Br. at 3.  But witnesses are competent to testify to what they personally know about family history, *see* Fed. R. Evid. 602, 803(13), (19), and a jury may give whatever weight it feels is appropriate to that testimony.  And contrary to Mr. King, we did not say in *Hebert* that DNA evidence is required.

Ms. Guess testified that, to her knowledge, no one in her family had Indian blood. Ms. Dunckel said someone told her an uncle and great aunt were registered Indians. But based on her inability to identify a tribe or any proof of their Indian status, her not even knowing her great aunt's last name or how to contact them, and her admission that she had no proof of family Indian blood, the jury could discount her initial statement about her great aunt and uncle. Also, tribal registration alone does not establish that someone has Indian blood, as evidenced by Ms. Dunckel's testimony.

On appeal, we must "consider[] the evidence in the light most favorable to the Government." *Pickel*, 863 F.3d at 1251 (quotations omitted). As applied here, a reasonable jury could, within its "broad discretion," *Coleman*, 566 U.S. at 655, discount Ms. Dunckel's testimony and rely on Ms. Guess's to find that Mr. King lacked Indian blood.

  2) Other evidence

Also supporting a reasonable inference that Mr. King lacked Indian blood were Mr. King's erroneous enrollment in the Delaware Tribe of Indians after the abuse, his text message to Ms. Anazagasty indicating he "wasn't tribal" at the time of the abuse, and his attempt to use his Delaware Tribe enrollment as a jurisdictional defense in the state prosecution. Based on the timing of his application to the Delaware Tribe, the jury could have inferred Mr. King attempted to enroll so he could avoid state prosecution despite having no Delaware Tribe blood quantum. The jury also could

have inferred that Mr. King had no blood as to any another tribe because he chose to attempt to enroll in the Delaware Tribe.

Special Agent Harrison's testimony that the FBI investigated Mr. King's mother's lineage by contacting various tribes and found no one in the family was enrolled with them also pointed to lack of Indian ancestors and therefore no Indian blood.

\*　　\*　　\*　　\*

Even if no single piece of evidence was sufficient to prove that Mr. King was not an Indian, the foregoing evidence in its totality was enough under our standard of review.

## B. *Multiplicity*

### 1. Additional Procedural History

Mr. King moved under Federal Rule of Criminal Procedure 12(b)(3)(B)(ii) to dismiss the indictment for multiplicity or to require the Government to elect between the charges before trial as to whether to prosecute him as an Indian or a non-Indian. The district court denied the motion, saying that under Tenth Circuit law "the problem is not multiplicity from the standpoint of" charging but of conviction. ROA, Vol. III at 8-9. The court therefore ruled the charges were permissible so long as they did not result in multiplicitous convictions, which could be avoided using an appropriate jury instruction.

2. **Legal Background**

  a. *Multiplicity*

"The Double Jeopardy Clause protects a defendant 'against cumulative punishments for convictions on the same offense.'" *United States v. Benoit*, 713 F.3d 1, 12 (10th Cir. 2013) (quoting *Ohio v. Johnson*, 467 U.S. 493, 500 (1984)). "Multiplicity refers to multiple counts of an indictment which cover the same criminal behavior." *United States v. McCullough*, 457 F.3d 1150, 1162 (10th Cir. 2006) (quoting *United States v. Johnson*, 130 F.3d 1420, 1424 (10th Cir. 1997)). "Although 'multiplicity is not fatal to an indictment,' multiplicitous counts which may result in multiplicitous convictions are considered 'improper because they allow multiple punishments for a single criminal offense.'" *Id.* (citations omitted) (first quoting *Johnson*, 130 F.3d at 1424; then quoting *United States v. Jenkins*, 313 F.3d 549, 557 (10th Cir. 2002)).

  b. *Standard of review*

"A decision of whether to require the prosecution to elect between multiplicitous counts before trial is within the discretion of the trial court." *Johnson*, 130 F.3d at 1426. "A court abuses its discretion when it 'renders a judgment that is arbitrary, capricious, whimsical, or manifestly unreasonable,'" *United States v. Martinez*, 92 F.4th 1213, 1227 (10th Cir. 2024) (quoting *United States v. Perrault*, 995 F.3d 748, 764-65 (10th Cir. 2021)), or "if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence," *id.* (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990)).

24

3. **Analysis**

The district court did not abuse its discretion. We have said "[t]he principal danger raised by a [multiplicitous] indictment is the possibility that the defendant will receive more than one sentence for a single offense." *United States v. Bolt*, 776 F.2d 1463, 1467 (10th Cir. 1985). That is why the district court could choose between "election of counts by the prosecutor prior to trial" or "the use of appropriate jury instructions" to remedy multiplicitous charges. *Id.*

The district court provided adequate safeguards to prevent multiplicitous convictions. First, the court instructed the jury that it could not convict Mr. King as both an Indian and a non-Indian. Second, it provided the jury with a special verdict form directing them to (a) acquit Mr. King entirely, (b) convict him as an Indian, or (c) convict him as a non-Indian. Under our precedent, that is all the court was obligated to do. *See Bolt*, 776 F.2d at 1467; *see also United States v. Driver*, 945 F.2d 1410, 1414-15 (8th Cir. 1991) (not reversible error to present alternate § 1152 and § 1153 charges to the jury).

Mr. King argues the Government's charging approach prejudiced him by making it more difficult to mount a defense. He provides no legal authority supporting the possibility of prejudice on this basis when the district court has properly instructed the jury to preclude multiplicitous convictions. But even if his theory of prejudice were legally cognizable, his prejudice claim here is conclusory. He fails to show adequately how the parallel charges affected his ability to present a defense.

25

## III. **CONCLUSION**

We affirm Mr. King's convictions.